(265 P.3d 1175)
No. 102,452

STATE OF KANSAS, *Appellee*, v. GEORGE JAMES BROOKS, III,
*Appellant.*

Opinion filed October 7, 2011.

*Lydia Krebs*, of Kansas Appellate Defender Office, for appellant.

*Jodi Litfin*, assistant district attorney, *Chadwick J. Taylor*, district attorney, and *Steve Six*, attorney general, for appellee.

Before ATCHESON, P.J., HILL and STANDRIDGE, JJ.

ATCHESON, J.: This is both a troubling and difficult case. While the facts and the law have divided the panel, the result pleases none of us.

## I. INTRODUCTION

First and foremost, Defendant George James Brooks, III, presents the following question for resolution: If a woman has sex with a man to avoid his publicizing her acutely embarrassing past or present conduct—and she makes clear to him that she otherwise would not do so—has he committed rape? The facts do not seem to fit especially well within the range of conduct criminalized in Kansas. A majority of the panel has concluded those circumstances do not constitute rape as defined in the Kansas Criminal Code and

construed in controlling precedent. As we discuss later, the Model Penal Code includes and a number of other states have enacted provisions criminalizing the sort of extortion Brooks practiced here as felony sex offenses.

A Shawnee County jury convicted Brooks of one count of rape, two counts of blackmail, and one count of breach of privacy. Brooks challenges the convictions for rape and breach of privacy. He has not appealed the convictions for blackmail.

The jury found that Brooks raped J.P., his ex-wife, when he demanded she have sexual intercourse with him or he would publicize an affair she had with a married coworker. J.P. told Brooks she did not want to have sex but submitted anyway rather than face the extreme embarrassment of having her workplace relationship exposed. The State proceeded on the theory that J.P. was "overcome by force or fear" when she yielded to Brooks' threat, thereby establishing rape in violation of K.S.A. 21-3502(a)(1)(A). We conclude the facts fail to satisfy the statutory elements of the offense, requiring reversal of the conviction for insufficient evidence. A judgment of acquittal on that charge is, therefore, entered. See *Tibbs v. Florida*, 457 U.S. 31, 40-41, 102 S. Ct. 2211, 72 L. Ed. 2d 652 (1982); *State v. Hollins*, 9 Kan. App. 2d 487, 489-90, 681 P.2d 687 (1984). Judge Hill dissents from that conclusion.

The panel unanimously holds the evidence fails to establish the requisite elements of breach of privacy, a misdemeanor, as defined in K.S.A. 21-4002(a)(1). That conviction is, therefore, reversed, and a judgment of acquittal is entered on the charge.

## II. THE FACTS

Brooks and J.P. married in 1996. They separated in May 2005 and were divorced 10 months later. On May 7, 2006, a Sunday, Brooks accessed J.P.'s e-mail account and forwarded to his own e-mail account copies of communications she had with a married male coworker in August and October 2005. The e-mails indicated J.P. and her coworker had been carrying on an extramarital affair.

Later on May 7, Brooks telephoned J.P. and told her he had copies of the e-mails. He read portions of them to her during the conversation. J.P. testified at trial that hearing Brooks read the e-

mails gave her a very sick feeling. She said Brooks concluded the conversation by saying he would be coming over to her house for sex that evening.

Brooks arrived at the house about 8:30 p.m. with a folder containing copies of the e-mails. He told J.P. that he would give copies to her employer and to her coworker's wife if she did not do as he said. J.P. asked Brooks to leave. But he told J.P. that he would carry out his threat to publicize her affair if she didn't have sex with him. J.P. told Brooks in no uncertain terms that she did not want to have sex with him and it would be against her will. He said that wasn't a problem. Brooks then directed J.P. to take off her underwear. When she hesitated, Brooks—in her words—"started getting agitated." J.P. complied. Brooks took off his pants and put on a condom. J.P. sat in a chair, and Brooks had intercourse with her. Brooks had his hands on her legs during the act. J.P. said she had her hands over her face and her eyes closed so she would not have to look at Brooks.

When Brooks was done, J.P. asked for the e-mails. He told her that their encounter had been a "test" and he would be back on Friday for more sex.

During her trial testimony, J.P. did not elaborate on Brooks' agitation. And she did not indicate that she thought Brooks would have physically harmed her had she refused to have sex. But she did believe he would disclose the affair. When Brooks confronted J.P., she and her coworker remained romantically involved. J.P. told the jury she did not want the relationship publicized because they worked closely and many of their colleagues knew her coworker's wife. J.P. said disclosure of the affair would have tainted the workplace and created something that "was not a good situation." But J.P. testified that she had no reason to think she would have been fired or would have suffered any adverse change in the terms or conditions of her employment were the affair to come to light. J.P. told the jury she and Brooks had sex on May 7 only because he had the e-mails and threatened to expose her workplace affair if she did not submit.

On Monday, May 8, J.P. told both her lawyer and her counselor what Brooks had done to her the evening before. They urged her

to contact the police. She did. A detective with the Topeka Police Department took a statement from J.P. and gave her a recorder to tape any calls from Brooks. She taped a message from her answering machine and several calls with Brooks. In those communications, Brooks asked for money in addition to another sexual encounter. J.P. agreed to meet with Brooks on May 12. When Brooks arrived at her home, police officers arrested him.

Brooks denied having sexual relations with J.P. earlier that week. He claimed she had offered to have sex with him to secure the return of the e-mails. Brooks testified he agreed, but they never actually had sex that evening. Brooks also testified that J.P. had given him her e-mail address and password. At trial, J.P. denied doing so and said Brooks had no authorization to access her e-mails.

The State charged Brooks with one count of rape, one count of attempted rape, two counts of blackmail, and one count of breach of privacy. The 4-day jury trial began on July 21, 2008. The jury found Brooks not guilty of attempted rape (stemming from his return to J.P.'s home on May 12) and convicted him on all of the remaining counts. On September 5, 2008, the trial court sentenced Brooks to 155 months in prison on the rape conviction, 12 months in prison on each blackmail conviction, and 12 months in the county jail on the breach of privacy conviction. Each of those terms of incarceration reflects a standard guideline sentence based on Brooks' lack of any past criminal conduct. The trial court ordered Brooks to serve the blackmail sentences consecutive to each other and consecutive to the rape sentence. The jail time was made concurrent to the other sentences, yielding a controlling term of incarceration of 179 months. Brooks has timely appealed.

### III. The Statutes

To facilitate the discussion in the balance of this opinion and in the dissent, we set forth at length the statutes governing each of the crimes of conviction.

In pertinent part, K.S.A. 2005 Supp. 21-3502 provides:

"(a) Rape is: (1) Sexual intercourse with a person who does not consent to the sexual intercourse, under any of the following circumstances:

(A) When the victim is overcome by force or fear;

(B) when the victim is unconscious or physically powerless; or

(C) when the victim is incapable of giving consent because of mental deficiency or disease, or when the victim is incapable of giving consent because of the effect of any alcoholic liquor, narcotic, drug or other substance, which condition was known by the offender or was reasonably apparent to the offender;

(2) sexual intercourse with a child who is under 14 years of age;

(3) sexual intercourse with a victim when the victim's consent was obtained through a knowing misrepresentation made by the offender that the sexual intercourse was a medically or therapeutically necessary procedure; or

(4) sexual intercourse with a victim when the victim's consent was obtained through a knowing misrepresentation made by the offender that the sexual intercourse was a legally required procedure within the scope of the offender's authority.

. . . .

"(c) Rape as described in subsection (a)(1) or (2) is a severity level 1, person felony. Rape as described in subsection (a)(3) or (4) is a severity level 2, person felony."

In pertinent part, K.S.A. 21-3428 provides: "Blackmail is gaining or attempting to gain anything of value or compelling another to act against such person's will, by threatening to communicate accusations or statements about any person that would subject such person or any other person to public ridicule, contempt or degradation." Blackmail constitutes a severity level 7, nonperson felony.

In pertinent part, K.S.A. 21-4002 provides:

"(a) Breach of privacy is knowingly and without lawful authority:

(1) Intercepting, without the consent of the sender or receiver, a message by telephone, telegraph, letter or other means of private communication; or

. . . .

"(b) Subsection (a)(1) shall not apply to messages overheard through a regularly installed instrument on a telephone party line or on an extension.

"(c) Breach of privacy is a class A nonperson misdemeanor."

## IV. CONVICTIONS

Defendant Brooks physically and emotionally abused his ex-wife on May 7, 2006. About that there is no question given the jury's verdict. Based on the nature of his conduct, as necessarily found by the jury, he deserves harsh punishment. And that is not to be. Brooks' actions do not satisfy the elements of rape as defined in the Kansas Criminal Code. Although the blackmail statute applies

to what Brooks did to J.P., the offense carries too lenient a punishment for the circumstances of this case. But we are forced to conclude, with considerable reluctance, that is the extent of Brooks' criminal liability for the depravity and indignity he inflicted on J.P.

In analyzing this issue, we apply a bifurcated review using different standards. We accept the facts in a light most favorable to the prevailing party, here the State, and in support of the jury verdict. An appellate court will neither reweigh the evidence generally nor make credibility determinations specifically that conflict with the verdict. *State v. Trautloff*, 289 Kan. 793, 800, 217 P.3d 15 (2009); *State v. Pham*, 281 Kan. 1227, 1252, 136 P.3d 919 (2006). We then ask whether the facts looked at that way establish the elements of the charged offense. That calls for the interpretation of the statutory language in light of the facts and poses a question of law. *State v. Arnett*, 290 Kan. 41, 47, 223 P.3d 780 (2010). An appellate court exercises plenary review in plumbing the meaning of a statute. 290 Kan. at 47.

## A. *Blackmail*

The evidence plainly supports the blackmail convictions under K.S.A. 21-3428. Brooks does not argue otherwise. He "compelled" J.P. "to act against [her] will" and did so "by threatening to communicate accusations or statements about [her] that would subject [her] to public ridicule [or] contempt." There is every reason to suppose J.P. correctly perceived that she would be subject to lacerating barbs, withering disdain, or (more likely) both were her adulterous workplace affair to become of the stuff of gossip. To avoid that emotionally crippling prospect, she gave in to Brooks' crude demand. And that adds up to blackmail on Brooks' part. The words of the statute have been cast broadly and surely cover the circumstances of this case.

At the same time, we doubt the legislature contemplated circumstances such as these in adopting the statute. The punishment seems to demonstrate as much. Blackmail is a severity level 7 nonperson felony. As felonies go, that is comparatively mild. For a defendant without any significant criminal history, as Brooks, the guidelines punishment would be 11 to 13 months in prison but

with a presumption of probation rather than incarceration. As we have said, that seems entirely too lenient when the victim has been coerced to submit to a violation of her bodily integrity and to a particular act that when compelled constitutes nothing less than defilement. For that reason, what happened to J.P. ought not be classified as a "nonperson" crime. Those crimes carry substantially less weight than person felonies in gauging a recidivist's criminal history for sentencing purposes.

## B. *Rape*

But the Kansas statute proscribing rape just as surely does not fit the circumstances of this case. Again, we conclude the legislature did not contemplate facts such as these in criminalizing rape or related sex offenses. Brooks was charged under the subsection of the rape statute that criminalizes sexual intercourse when the victim has been "overcome by force or fear." K.S.A. 2005 Supp. 21-3502(a)(1)(A). None of the other subsections even arguably could apply to the situation J.P. described to the jury.

### *Force or Fear: A Single Means of Committing Rape*

In analyzing why K.S.A. 2005 Supp. 21-3502(a)(1)(A) does not cover what happened to J.P., we start by determining whether the phrase "force or fear" describes a single means of committing rape or alternative means. The issue is important when a jury is instructed using that term to describe one of the elements of the offense. If "force or fear" is a single means, as we would suggest the Kansas Supreme Court has ruled, then the evidence need only support one or the other to uphold a verdict of guilty. That is, the defendant may have used force alone or fear alone to induce the victim's compliance.

If, however, the "force or fear" language describes alternative means and the prosecution declines to elect one or the other, resulting in a jury instruction on both, the evidence must be sufficient to support each. If a jury has been instructed on alternative means, all of the jurors must be convinced beyond a reasonable doubt the defendant committed the offense. But the jurors need not agree on which of the alternative means has been proven. *State v. Wright,*

290 Kan. 194, Syl. ¶ 2, 224 P.3d 1159 (2010). A general verdict of conviction is legally proper so long as the record contains sufficient evidence to support each means. *Wright*, 290 Kan. 194, Syl. ¶ 2; *State v. Stevens*, 285 Kan. 307, 316, 172 P.3d 570 (2007). Should evidence be lacking on one of the means, however, then a guilty verdict fails for insufficient evidence, requiring the court to enter a judgment of acquittal. See K.S.A. 22-3419(1); *Hollins*, 9 Kan. App. 2d at 489-90 (On its own motion, a court may enter a judgment of acquittal if the evidence "is insufficient to sustain a conviction" of the crime charged.). Settling whether "force or fear" is a single means or alternative means directs the balance of our inquiry into the sufficiency of the evidence to support the conviction.

The Supreme Court's analysis in *Wright* treats "force or fear" as a single means of committing rape. *Wright*, 290 Kan. at 206-07. The rape conviction in that case could not have been affirmed if "force or fear" presented alternative means. In *Wright*, the trial court instructed the jury that the defendant could be convicted if the sex act were the product of "force or fear" or if the victim had been unconscious and, thus, unable to give consent. 290 Kan. at 199. The evidence established that a woman fell asleep while receiving a massage and awoke to find the masseuse digitally penetrating her. The woman said she was startled, afraid, and then tense; she, therefore, did not immediately tell the masseuse to stop. The masseuse apparently sensed her client's discomfort and quit.

On appeal, the defendant masseuse argued the evidence failed to support each of the alternative means identified in the jury instructions. The court found the victim's testimony about being "paralyzed with fear" upon awakening to be sufficient to support a verdict based on fear. 290 Kan. at 206-07. Nobody disputed the victim's testimony that she had fallen asleep before the assault had begun supported a verdict based on unconsciousness.

But the Supreme Court neither mentions nor analyzes the lack of any evidence suggesting use of force to overcome the victim. The State never argued that the defendant used force, only that the victim was fearful once she realized what was happening to her. Similarly, the defendant argued to the Supreme Court that the only evidence to support a conviction by force or fear was the victim's

fearfulness in the midst of the offending act. Throughout its opinion in *Wright*, the Supreme Court describes "force or fear" in terms consistent with its being a single means. 290 Kan. at 199 (The court describes the defendant as arguing the jury should not have been instructed on force or fear "because the evidence was insufficient on *that* alternative means of committing the crime" and suggests no error in such a characterization of force or fear as one means. [Emphasis added.]); 290 Kan. at 199 (The court notes that the trial judge discussed a verdict form listing "the two alternative means of committing rape, thereby giving the jury the option to convict Wright on either, both, or neither[;]" but the court never suggests there were actually three means: by force, by fear, and inability to consent due to unconsciousness).

The Supreme Court explicitly looked at the sufficiency of the evidence to support "force or fear" as a single means of committing rape and then to support lack of consent due to unconsciousness as another alternative means. 290 Kan. at 206-07. The court noted the victim testified that when she awoke and realized what Wright was doing to her, she "was paralyzed with fear." And that was "sufficient to find Wright guilty beyond a reasonable doubt of committing rape by force or fear." 290 Kan. at 206. The court, then, concluded: "[T]he evidence of each means of committing rape— by force or fear or by unconsciousness—was sufficient to uphold a guilty verdict on the rape charge." 290 Kan. at 207. On that basis, the Supreme Court affirmed the rape conviction.

Had the *Wright* court treated "force or fear" as alternative means to commit rape, it would have had to reverse the conviction because there was no evidence the defendant used force to overcome the victim. In short, only if "force or fear" represents one means of violating the rape statute does the analysis and result in *Wright* make sense. We, therefore, accept the rationale and outcome of *Wright* as authoritative precedent for the proposition that "force or fear" is a single, unified means of committing rape. A conclusion that force and fear reflect independent and alternative means depends upon branding *Wright* as either illogical or outcome driven in disregard of the statutory language defining rape.

The Kansas Supreme Court's earlier decision in *State v. Timley*, 255 Kan. 286, 290, 875 P.2d 242 (1994), certainly suggests force or fear may be alternative means of committing rape. But that suggestion ultimately is unstudied dicta. Timley challenged the "force or fear" language in a rape elements instruction on a multiple acts theory. He argued the prosecutor had to elect either force or fear or, absent an election, the jury should have received a unanimity instruction as well. The court rejected that argument and contrasted multiple acts issues with alternative means issues. 255 Kan. at 289-90. The court went on to observe that Timley conceded the victims provided testimony supporting both his use of force and his use of fear during the offenses and discounted any alternative means problems. 255 Kan. at 290. But, of course, that wasn't Timley's argument. The court made no studied determination as to whether "force or fear" constituted one means of committing rape or alternative means. It merely assumed them to be alternative means for purposes of tidying up what amounted to a loose end of no material consequence to the asserted issue. By any measure, that's dicta.

*Insufficient Evidence of Force*

Even if we were mistaken in assessing *Wright*, Brooks' conviction for rape must be set aside for insufficient evidence. In that circumstance, the evidence would have to support a jury finding that J.P. was overcome by both force and fear. But the record is bereft of any evidence Brooks used force to compel J.P.'s compliance with his demand. To the contrary, he coerced her solely with threats to expose her workplace affair. Brooks did not touch J.P. at all until sexual intercourse occurred. Physical contact that is part of the act of penetration itself does not amount to force of the type violating the rape statute. *State v. Bunyard*, 281 Kan. 392, 406-08, 133 P.3d 14 (2006) (The prosecutor misstated the law in arguing to the jury that the act of penetration "satisfied the force element of the rape charge[,]" and the error was sufficiently egregious as to require reversal of the conviction.).

*Applying Force or Fear as a Single Means*

Having digressed briefly, we return to how force or fear as a single means of committing rape should be applied in this case. First, there must be some commonality or relationship between the type of force that suffices to violate the rape statute and the fear that does. In other words, the victim must be fearful of the sort of force contemplated in the statute. Absent that connection, force and fear would amount to alternative means of committing rape. They would be sufficiently distinct to be separate ways of overcoming a victim.

Consistent with our understanding of *Wright*, we now consider the sorts of force and concomitant fear that are sufficiently coercive to overcome a victim under K.S.A. 2005 Supp. 21-3502.

Plainly, physical force applied to the victim suffices. And, in turn, a threat of physical harm to the victim to compel compliance also violates the rape statute by inducing fear. A threat need not be verbalized; a perpetrator armed with a weapon presents a sufficient threat without saying a word. See *State v. Borthwick*, 255 Kan. 899, 900, Syl. ¶ 7, 880 P.2d 1261 (1994) (A rape victim need not be overcome by force in the form of a beating or physical restraint; fear is sufficient.). Likewise, a threat need not be of immediate harm to induce fear. A perpetrator's threat to come to the victim's workplace and shoot her certainly could cause fear.

A perpetrator who knowingly exploits a victim's extreme phobia, by definition an irrational fear, to overcome resistance probably commits rape. The test for "fear" is a subjective one. In other words, did the victim genuinely fear harm even though a reasonable person in the same situation might not? See *Borthwick*, 255 Kan. at 913 (The victim's fear of force need not be such "that [it] would prevent resistance by a reasonable person."). The perpetrator's threat to expose the victim to conditions or circumstances that would trigger the phobia thereby causing fear probably suffices to establish a submissible jury case. That sort of threat might well implicate another means of committing rape in which the victim "is incapable of giving consent because of mental deficiency or disease." K.S.A. 2005 Supp. 21-3502(a)(1)(C). The actions of the

perpetrator also might well require the use of force or threat of force. For example, were the victim an agoraphobic, someone with the fear of open spaces or the outdoors, the perpetrator presumably would threaten to force the victim outside of his or her home, thus inducing the fear, anxiety, and other discomfort associated with his or her condition. We do not mean to belabor unnecessarily the phobic as victim—the circumstance is unlikely to come up commonly. But the soundness of judicial reasoning is often tested by its application to the unusual situation. And the boundaries of statutory law are regularly defined by those situations, as this case illustrates.

Physical harm or the threat of harm to a close relative or friend of the victim, particularly someone residing in the same household, would be adequate. The term "force" is neither limited to the victim nor otherwise qualified in the rape statute.

As with much else in the criminal law, sorting out the circumstances of the force or fear and their sufficiency to overcome the victim's resistance commonly would be for a well-instructed jury looking at the particular facts of a given case. *Borthwick*, 255 Kan. at 899, Syl. ¶ 5. There could be peculiar (and rare) circumstances in which a jury might find the victim's fear to be honestly held but wholly without foundation or the perpetrator's threat of physical harm so improbable to carry out as to be fantastic. Those determinations would stand apart from prototypical credibility determinations for jurors, such as a defendant's claims of mistaken identity or consent.

Applying the "force or fear" means of committing rape becomes more difficult when the perpetrator's actions entail economic harm, rather than physical injury. Again, nothing in the broad phrasing of "force or fear" in K.S.A. 2005 Supp. 21-3502 suggests the term is limited to physical injury. If a rapist began destroying especially valuable property—fine art or antiques—and intended to stop only if the victim had sexual relations, a jury could render a fully supportable guilty verdict under Kansas law. Similarly, a cognizable threat to burn down the victim's home contemplates use of force and would be sufficient to support a jury finding of fear on the victim's part.

There likely would be a point at which the resulting economic harm might be too slight to support a charge as a matter of law. We needn't determine that point, for the evidence here shows J.P. did not believe the threat to publicize her affair would have any economic impact on her. And there would be some point—perhaps a different one—beyond which the State might reasonably predict a jury could be expected to bring back a not guilty verdict because the threatened financial harm was essentially inconsequential in a given factual setting. A prosecutor reasonably might choose not to charge that case.

Other economic threats entail no application of force immediately or in the future and, thus, could not induce the sort of fear necessary to violate K.S.A. 2005 Supp. 21-3502. For example, a perpetrator could threaten to spread false rumors to the major customers of the victim's company that the business was under criminal investigation or insolvent if the victim refused sexual demands. The victim might well fear the loss of some of those customers and comply with the demand. But the perpetrator's actions do not amount to a use of force or a threat of force. In that instance, the perpetrator would have violated the blackmail statute, just as Brooks did here. Those circumstances, however, do not fit within the rape statute.

J.P.'s predicament was still further removed from the proscribed conduct in K.S.A. 2005 Supp. 21-3502. Even if Brooks carried out his threat to publicize the affair, J.P., by her own reckoning, faced no economic loss or harm. She believed she would have been acutely embarrassed in the workplace, perhaps ostracized by some colleagues, and otherwise scorned or ridiculed. Those concerns certainly seem rational and legitimate. The emotional impact of the disclosure on J.P. may have been substantial. She certainly thought it would be; she submitted to Brooks' demand for sex to avoid precisely that possibility. We do not diminish those considerations. But the threat Brooks made did not involve any present or future application of force and, in turn, the response it provoked in J.P., however disquieting or upsetting, did not constitute fear of the sort that supports a rape charge under the Kansas law. As a result, the

jury's verdict rests on insufficient evidence to demonstrate the statutory elements of rape.

The result here is a product of the Kansas Criminal Code's failure to address in some specific fashion the sort of tactic Brooks used. He essentially extorted sex from J.P. in what the jury found amounted to rape by blackmail. But the conduct doesn't fit the definition of rape and seems substantially worse than what's proscribed and punished as blackmail. As we have also suggested, this outcome seems to be the result of inadvertent omission in drafting the criminal code rather than a conscious policy choice to impose a comparatively lenient punishment on a criminal like Brooks. The criminal code simply does not speak directly to the criminality of threatening to invade a person's privacy or to expose him or her to public ignominy as a means of extracting sexual relations. The code fails to consider the intersection of those two strands of antisocial behavior to carry out a single criminal endeavor.

The blackmail statute applies only because it has been drafted in generic terms to cover forcing a person to do something by threatening public ridicule or disgrace. It doesn't expressly take into account circumstances where that something is coerced sexual relations. The offense of sexual battery, K.S.A. 21-3517, also would apply to what Brooks did to J.P. The crime entails "intentionally touching" someone without his or her consent for purposes of "arous[ing] or satisfy[ing] the sexual desires of the offender or another." Again, the statutory language covers what happened in this case. But it seems unlikely the statute aims to punish the criminal act of penetration as an intentional touching, as that term is used. Sexual battery is a misdemeanor. The code has also criminalized "aggravated sexual battery," proscribing the same type of touching when the perpetrator uses some of the same kinds of means prohibited in the rape statute, including force or fear. Aggravated sexual battery is a severity level 5 person felony. But it would not apply here for the same reasons the rape statute does not.

*What the Model Penal Code Recommends and Some Real World Examples*

The Model Penal Code and a number of states codify and criminalize the sort of exploitation Brooks inflicted on J.P. They treat the offense as a degree of rape or a separate sex crime.

The MPC and its commentary, drafted under the auspices of the American Law Institute, reflect the studied consideration of academics and practitioners (both judges and lawyers) in the field of criminal law. The MPC includes a form of rape called "gross sexual imposition" that criminalizes the conduct of a male who compels a female to submit to sexual intercourse by making "any threat that would prevent resistance by a woman of ordinary resolution[.]" MPC § 213.1(2)(a), at 275 (1980). (The MPC was released in final form in 1962, and the comments were last revised 30 years ago. The gender specific language seems dated. Many rape statutes are now gender neutral. That is, a female can rape a male. The Kansas statute has been written that way. As a result, for example, a woman having sexual relations with a male less than 14 years old commits rape in Kansas.) The MPC treats gross sexual imposition as a serious felony offense, but not so severe as rape by force or "threat of imminent death, serious bodily injury, extreme pain or kidnapping, to be inflicted on anyone[.]" MPC § 213.1, at 274-75 (Rape is a "first degree" or "second degree" felony depending on case-specific factors, while gross sexual imposition is a "third degree" felony.).

In the commentary to § 213.1, the drafters of the MPC give as examples of threats rising to the level of gross sexual imposition: "[A] threat to cause [the victim] to lose her job or to deprive her of a valued possession." MPC § 213.1, Comment, at 312. An actionable threat may, but need not, entail "economic injury;" the gist of the offense "rests on the judgment that using one's ability to cause harm in order to override the will of a reluctant female is wrongful and should be punished." MPC § 213.1, Comment, at 312. The drafters point out, however, that some threats may be too trivial to warrant the harsh criminal sanctions imposed for this crime. They give as an example a police officer who offers to dis-

card a parking ticket in exchange for sex. MPC § 213.1, Comment, at 313. They also suggest that in less paradigmatic examples— messy real-world situations—there may be difficulty distinguishing criminal coercion from offensive, though not prosecutable, bargaining. MPC § 213.1, Comment, at 314 (A wealthy man threatening to withdraw financial support from his unemployed girlfriend unless she has sex with him would not commit gross sexual imposition because he has not so much engaged in "compulsion" as he has offered "an unattractive choice to avoid some unwanted alternative."). The drafters suggest one practical way of separating criminal coercion from reprehensible bargaining enlists the line drawn for extortion or blackmail. Those threats constituting criminal blackmail would be sufficiently coercive to amount to gross sexual imposition if made to overcome a person's opposition to engaging in sexual relations. MPC § 213.1, Comment, at 314-15.

Brooks' conduct, as found by the jury, violated the Kansas blackmail statute. In turn, the threat he made to J.P. would support a charge of gross sexual imposition under the MPC.

Without undertaking a comprehensive review of other states' statutes, we note several jurisdictions that treat what Brooks did here as a serious sex crime. For example, in Florida, a person commits "sexual battery," a first-degree felony, by coercing the victim to submit to sexual intercourse because of "threat[s] to retaliate against the victim[.]" Fla. Stat. § 794.011 (2007). The statute defines "retaliation" to include "extortion." Under Florida law, extortion is itself a felony embracing, among other things, the use of threats to injure a person's reputation, to expose another to disgrace, or to reveal "any secret affecting another" for the purpose of compelling the victim "to do any act or refrain from doing any act against his or her will." Fla. Stat. § 836.05 (2007). Delaware has criminalized "sexual extortion," defined to include compelling a person to engage in sexual intercourse by means of threats to "expose a secret or publicize an asserted fact, whether true or false, intending to subject anyone to hatred, contempt, or ridicule" or by means of an act "calculated to harm another person materially" as to his or her "health, safety, business, calling, career, financial condition, reputation, or personal relationships." Del. Code Ann. tit.

11, § 774 (2010 Supp.). Sexual extortion is punishable by a sentence of up to 5 years in prison. The New Hampshire Legislature has enacted the offense of "aggravated felonious sexual assault" that includes sexual intercourse accomplished "when the actor coerces the victim to submit by threatening to retaliate against the victim . . . [who] believes that the actor has the ability to execute these threats in the future." N.H. Rev. Stat. Ann. § 632-A:2(I)(d) (West 2010 Supp.). Under the New Hampshire statute, "retaliate" means "to undertake action against the interests of the victim, including . . . public humiliation or disgrace." N.H. Rev. Stat. Ann. § 632-A:1(II)(c) (West 2010 Supp.).

In each of those states, Brooks would face harsher penalties than he did under the criminal code in effect in Kansas at the time he abused J.P. As we read the new criminal codification that went into effect on July 1, 2011, it contains the same gap that has allowed Brooks to avoid conviction for a felony sex offense.

The dissent takes us to task for the result we reach—an understandable visceral reaction to the circumstances of this case, but one incompatible with the facts and the law. That's what makes this a difficult case. The courts, however, have no license to disregard the facts and the law to avoid an unpalatable outcome.

The dissent contends we have ignored the tenor of the testimony—tone of voice, body language, and the like—from which, the dissent says, a jury could have convicted Brooks of rape. Having thoroughly reviewed all of the trial testimony as favorably as possible to the State's position, we have concluded the evidence fails to establish the statutory elements necessary to convict Brooks of rape. J.P. did not testify that she feared Brooks would physically harm her or that he threatened to do so. No such words or anything like them were uttered at trial. J.P. did not testify that she feared Brooks would physically harm the children or that he threatened to do so. No such words or anything like them were uttered at trial. Had there been such testimony, the evidence would have supported a guilty verdict on the rape charge.

J.P. told the jury she had sex with Brooks on May 7 because she believed he would reveal her workplace affair and she did not want to face the emotional repercussions of that disclosure. Jurors may

consider the tenor of a witness' testimony in deciding whether to believe the words that witness has spoken on the stand. That is true of J.P., Brooks, or anyone else giving testimony. But jurors cannot find in those mannerisms words and entire sentences unspoken in court and use such constructs to supplement the actual evidence to render a verdict that suits their sense of fairness notwithstanding the law. But the dissent implies just such an approach and uses it to criticize our legal conclusion. It suggests the jury could have inferred some additional reason J.P. submitted to Brooks' demand from the way she testified despite the words she spoke.

The dissent also suggests we have ignored "emotional force." But the dissent never really defines the term and cites no caselaw doing so or applying it. The concept cannot be the use of actual or physical force against the victim, another person, or property. It must be, then, as we have discussed, the threat to do something designed to induce compliance. But the threat here, to expose an extraordinarily embarrassing aspect of J.P.'s life, was not a threat to use force. And her understandable reaction was not fear of force but fear of that embarrassment. This case does not rest on "force or fear" as used in the Kansas rape statute, especially as a single means of committing the offense. Relabeling the facts does not change them or their legal significance.

The dissent complains that our analysis is "complex and confusing," but its purported antidote in the form of an unexplained "emotional force" doctrine is worse. Apart from this case, how is that concept to be applied? Suppose a landlord offers to forgive a month's delinquent rent to a young, single mother and to stop an eviction proceeding in exchange for sexual relations. What about a college professor giving a student on academic probation an undeserved A rather than a D in exchange for sex, thereby allowing the student to avoid the ignominy of dismissal from school? There quite arguably is emotional force or something like it at play in those situations. Given the absence of clear legislative intent to criminalize that conduct as rape, the courts ought not be creating theories that do, no matter how convenient or fair that might seem in the case at hand.

Finally, the dissent says the consequence of our decision is a return to circumstances in which a rape victim must physically resist and suffer injury to establish a prosecutable case. We say no such thing, and our decision doesn't lead to that result at all. Had Brooks threatened physical harm to J.P. or her children, she had no obligation to resist. The threat would have been sufficient to prove a rape, since her fear would have been of actual force. Had J.P. told Brooks she didn't care if he told about her affair and he then threatened to beat her or drew a weapon, her submission to that demand would have supported a rape conviction. J.P. would not have had to resist.

The facts of this case fail as a matter of law to establish the crime of rape as it is defined in Kansas. We can neither pretend the jury found phantom facts nor use a new phrase for the actual facts to change that result, much as we might be tempted.

## C. *Breach of Privacy Conviction*

Brooks also challenges the sufficiency of the evidence to support his conviction for breach of privacy as criminalized in K.S.A. 21-4002. He argues the evidence does not show that he "intercepted" the e-mail communications sent between his wife and her coworker. In analyzing this issue, we apply the same bifurcated standard of review we described earlier.

Taking the facts in a light most favorable to the State, we, therefore, presume Brooks did not have authorization to access J.P.'s e-mail account or to read, forward, or copy any of her electronic correspondence, including those with her paramour. The jury so found in convicting Brooks, and ample evidence supports that determination. The evidence also shows that Brooks accessed the account and obtained the e-mails on May 7, 2006, some 7 to 9 months after they were sent. The hard copies of the e-mail introduced at trial indicate J.P. composed and sent the e-mails to her coworker. The hard copies show no responses from him and, thus, no extended communication threads between the two.

Although the breach of privacy statute antedates any common use of e-mail, the parties do not dispute the medium constitutes "private communication" within the meaning of K.S.A. 21-4002.

Their tacit assumption of common ground on the point seems well taken. We recognize the e-mail J.P. sent to be protected communication.

The controlling issue then comes down to whether accessing an e-mail from the sender's account (presumably the sent box or an archived file) months after it was composed and directed to the addressee amounts to "intercepting" that communication as prohibited in K.S.A. 21-4002(a). This court, therefore, must interpret the statutory language and decide a matter of law. *Arnett*, 290 Kan. at 47.

When doing so, the appellate courts are to glean the legislative purpose and intent from the language used, and they are to give effect to that purpose and intent. *State v. Gracey*, 288 Kan. 252, 257, 200 P.3d 1275 (2009); *Hall v. Dillon Companies, Inc.*, 286 Kan. 777, 785, 189 P.3d 508 (2008). It is not the courts' business or function to add to or take away from the language of a statute. And the courts should not impose some meaning on a statute beyond what the words themselves convey through their common and usual definitions. *Gracey*, 288 Kan. at 257. Where there is some play or flexibility in the meaning of the phrasing in a criminal statute, the rule of lenity requires making the interpretative call in favor of the defendant. *Trautloff*, 289 Kan. at 796-97. ("Any reasonable doubt as to the meaning of the statute is decided in favor of the accused.").

The parties have directed us to no Kansas appellate decision construing the term "intercept" or "intercepting" as used in K.S.A. 21-4002 or elsewhere in the Kansas Criminal Code. We have not found such a case either. In Black's Law Dictionary 883 (9th ed. 2009), "intercept" is defined as: "To covertly receive or listen to (a communication)." The term, in that context, usually "refers to covert reception by a law-enforcement agency" in the manner of a wiretap. Black's Law Dictionary 883. Common usage ascribes several meanings to "intercept." It may mean "to stop, seize, or interrupt in progress or course or before arrival." Merriam-Webster's New Collegiate Dictionary 651 (11th ed. 2003). More likely applicable here, it means "to receive (a communication or signal di-

rected elsewhere) usu[ally] secretly." Merriam-Webster's New Collegiate Dictionary 651.

Brooks presses the meaning entailing stopping or seizing something before its arrival. But that definition really makes little sense as the exclusive one for the crime of breach of privacy. The statute criminalizes, among other acts, "intercepting . . . a message by telephone[.]" To stop a telephone call before its arrival—that is, before the party called answers—results in no communication at all. There would be no message to intercept. Accordingly, that definition standing alone cannot be the proper one.

What makes more sense is a meaning reflecting covert access to the communication while in transit from the sender to the recipient without necessarily delaying or impeding the transmission. A telephone wiretap would be an example of a prohibited interception. The communication is not disrupted or delayed, but a third party listens without authorization of the participants. The third party may also record the communication, although that is not an element of the offense. The statutory exemption for telephone calls overheard through regularly installed equipment on a party line lends support to that reading of the statute. Without the exemption, that sort of activity presumably would be covered under the general definition of the offense in K.S.A. 21-4002. Were the statute applicable only to conduct stopping communication, the legislature would not have believed the exemption necessary. (Even if party lines have now gone the way of coin-operated pay phones, the legislature's inclusion of that language when the measure was drafted some 40 years ago sheds light on the statutory meaning. The inclusion of "telegraph" communication in the statute seems similarly antiquated in today's computerized society.)

The statute also prohibits "intercepting" letters. We suppose that could occur if a third party filched the letter after the writer left it with other outgoing mail in an office setting or once a postal worker deposited it in the recipient's box. The offender then could clandestinely open the envelope, read (and possibly copy) the contents, return the letter, and reseal the envelope to complete delivery to the recipient. The offender also could simply keep or destroy the letter. That probably would violate K.S.A. 21-4002, as well, by tak-

ing "intercepting" to mean stopping or seizing the communication. There is no reason a statutory word or phrase cannot incorporate two related, if different, common meanings. Taking and keeping the letter would also amount to theft under K.S.A. 21-3701 by "[o]btaining or exerting unauthorized control over property." Perhaps of even more consequence to the perpetrator, the conduct would violate federal criminal laws regarding interference with mail. See 18 U.S.C. §§ 1702, 1703, 1708 (2006).

While we hesitate to draw too much of an analogy between e-mail and traditional mail, e-mail could be subject to interception during transmission from sender to recipient. We understand that to be technologically possible but somewhat unlikely. See *United States v. Szymuszkiewicz*, 622 F.3d 701, 704-05 (7th Cir. 2010) (discussing methods of transmitting e-mails); Email Privacy, *www.nolo.com/legal-encyclopedia/email-privacy-29610.html* (accessed June 22, 2011); ABA Formal Op. 99-413 (March 10, 1999) (The ethics committee finds no ethical violation in lawyers using unencrypted e-mail to communicate with consenting clients, in part, because of the difficulty of intercepting an entire message in transit.). An e-mail theoretically could be "intercepted" in transmission in violation of K.S.A. 21-4002. More commonly, the privacy of e-mail communication may be compromised because the message is unintentionally misdirected, its electronic storage compromised, or a hard copy slips away. See Reach, *Enjoy Email Responsibly*, 44 Ark. Law 30, 30-31 (Summer 2009); DuBoff & King, *E-Mail Traps And Troubles*, 69 Or. St. B. Bull. 36, 36-37 (July 2009).

What Brooks accomplished here does not violate K.S.A. 21-4002. He accessed electronic copies of e-mails the writer retained after sending the communication months earlier. It is difficult to see how that amounts to intercepting those e-mails. They were not in the process of being delivered at all. Again, to borrow a traditional letter analogy, his action was of a kind with taking an unauthorized look at a file copy of a letter sent out 6 months earlier. To consider that "intercepting" strains any definition.

Brooks notes a broad definition of "intercept" in K.S.A. 22-2514(3) but says it does not apply. The State, wisely we think,

advances no contrary assertion. By its terms, K.S.A. 22-2514 confines the definitions there to use in the Kansas Code of Criminal Procedure in Chapter 22. The legislature, then, meant the definition should not be transplanted to the criminal code in Chapter 21. The courts would overstep their role in interpreting statutes to ignore the sort of explicit limitation in K.S.A. 22-2514. In the Code of Criminal Procedure, that definition shapes when law enforcement agencies must obtain advance court approval to secretly intercept private communications. The broad definition, then, serves to insulate citizens against undue government intrusion. Had the legislature intended to blend that public policy with the punishment of private misconduct—the general purpose behind the criminal code—it would have expressly incorporated the definition in K.S.A. 22-2514 into the criminal code or specific statutes within that chapter.

The federal government has criminalized the interception of electronic communication in 18 U.S.C. § 2511(4) (2006) and has provided an additional private civil remedy in 18 U.S.C. § 2520 (2006). Those statutes use the same definition of "intercept" as contained in K.S.A. 22-2514(3). 18 U.S.C. § 2510(4) (2006). The federal courts generally have treated stored e-mails or other computer files as being outside the scope of both the criminal proscription and the civil cause of action. See *Szymuszkiewicz*, 622 F.3d at 705-06; *Fraser v. Nationwide Mut. Ins. Co.*, 352 F.3d 107, 113 (3d Cir. 2003) ("Every circuit court to have considered the matter has held that an 'intercept' under the [federal statutes] must occur contemporaneously with transmission.") (cases cited). To the limited extent those cases have some relevance, they support the interpretation we give the term "intercepting" in the breach of privacy statute, K.S.A. 21-4002. On the whole, however, we think they might be of substantially more persuasive value in construing K.S.A. 22-2514 and the requirements for judicially authorized interception of various forms of communication, where the Kansas Legislature has chosen to employ the same definitions as the federal statutes. Since K.S.A. 22-2514 expressly limits the application of the definitions set out there, federal caselaw construing com-

parable definitions should be similarly limited as a source for construing Kansas statutory law.

For the most part, what we have said to this point is an academic comment on the State's effort to prop up a peculiar charging decision. In short, we fail to see how the facts of this case taken in the best light for the State fit within the breach of privacy statute. But it's not as if Brooks' conduct in obtaining unauthorized copies of J.P.'s e-mails from her account would otherwise go unpunished. The legislature has enacted a specific criminal statute covering exactly what the jury necessarily found Brooks did in obtaining the e-mails. And that statute carries harsher penalties than does breach of privacy. (Had the jury bought Brooks' version that J.P. gave him the password and other information to access her e-mail, it would have come back with a not guilty verdict.)

Under K.S.A. 21-3755(b)(1)(A), the offense of "computer crime" includes "intentionally and *without authorization accessing* and . . . copying . . . or taking possession of a computer, computer system, computer network or any other property." (Emphasis added.) The offense also includes "intentionally *exceeding the limits of authorization* and . . . copying . . . or taking possession of a computer, computer system, computer network or any other property." (Emphasis added.) K.S.A. 21-3755(b)(1)(C). The term "property" is defined to be, among other things, "information" and "electronically produced or stored data[.]" K.S.A. 21-3755(a)(8). The statute, then, punishes unauthorized copying of information or electronic data. See *State v. Rupnick*, 280 Kan. 720, 738, 125 P.3d 541 (2005) (The court holds the term "copying," as used in K.S.A. 21-3755, adequately conveys notice of the prohibited conduct and finds the violation depends not on "how much of an original was . . . duplicated," but whether it was "duplicated at all."). That easily covers the conduct the State imputed to Brooks in charging him and what the jury concluded he did in finding him guilty of breach of privacy. It also does so without requiring the verbal contortions necessary to make the description of breach of privacy embrace the wrongful conduct. Computer crime is a severity level 8 nonperson felony, K.S.A. 21-3755(b)(2), rather than a misdemeanor.

The computer crime statute has been on the books in its current form since 1997 and, thus, was available to the State in prosecuting Brooks in 2006.

We find that the evidence, even taken in a light most favorable to the State, fails to support the crime of breach of privacy. When Brooks accessed J.P.'s e-mail account and copied communications she had sent more than 6 months earlier, he did not "intercept" them within the meaning of K.S.A. 21-4002. He could not, as a matter of law, be guilty of that offense. Accordingly, we are constrained to reverse Brooks' conviction on the charge of breach of privacy and to enter a judgment of acquittal.

## V. CONCLUSION

When it comes to statutory law, the judiciary must apply what the legislative branch has adopted and what the executive branch has approved and then enforces. In this case, we believe we have faithfully adhered to that duty. But we are dismayed at the result, particularly with respect to the rape charge. The outcome leaves J.P. without a full measure of justice for what Brooks did to her in this case. And the people of this state have neither adequate penal sanctions to invoke in the next case nor sufficient deterrent punishments to prevent what would be the case after that.

We affirm Brooks' convictions for blackmail. We reverse and enter judgments of acquittal on the convictions for rape and breach of privacy.

\* \* \*

HILL, J., dissenting: I must respectfully dissent from my colleagues' choice of overturning this man's rape conviction. They call for new legislation to cure what they perceive is a problem. Without seeing a witness, without hearing a voice, and without observing the victim confronted by the defendant, the majority is substituting its verdict for that of the jury when it holds there is not enough evidence presented in this trial to prove Brooks used force to rape his former wife. In contrast, a jury that did see the witnesses, did hear their testimony, and did observe the demeanor of the victim and the defendant during the course of the trial, held there was

sufficient evidence. After weighing the words in the trial transcript, the majority has decided that the evidence does not comply with the majority's complex and confusing notions of the amount of force legally necessary to obtain a conviction for rape. By doing so, it has minimized the use of psychological force to a virtual inapplicability in these situations. At the same time, it has tried to quantify the amount of fear necessary to sustain a rape conviction and provided scenarios that confuse, rather than clarify. I cannot tell from the majority opinion what constitutes sufficient force or fear to sustain a rape conviction in these situations.

With many words and much hand-wringing, the majority asserts that Brooks used no force, but only fear, to obtain sexual intercourse from his former wife. The majority concludes: ". . . [T]he threat Brooks made did not involve any present or future application of force and, in turn, the response it provoked in [the victim], however disquieting or upsetting, did not constitute fear of the sort that supports a rape charge under the Kansas law." In other words, in the view of the majority, this victim did not have a valid fear. To the contrary, after hearing the following testimony and being properly instructed by the trial court on the law of rape in this state, his jury did find her will was overcome by force or fear:

"Q. When he confronted you with [the e-mails], reading them over the telephone, what was—what was your reaction to that?

"A. I felt ill. I just—I just couldn't believe it, and I just—it was just a very sick feeling.

"Q. And these are the e-mails that he brought with him on May 7th?

"A. Yes.

. . . .

"Q. When [their young daughter] was asleep, what happened?

"A. He told me to come down.

"Q. Did you go downstairs?

"A. I hesitated, but, yes, I did.

"Q. Once you got downstairs, what happened?

"A. I tried to reason with him, I tried to get him to leave. I didn't, you know, I didn't want him there, and he got agitated, and his threats just remained the same, that he would take those e-mails, and he said he had copies of them at his apartment, and, you know, there is nothing that I could do to keep him from carrying out his threats, and if I didn't have sex with him, then—

"Q. Did you—well, what did you say to him when he's making these demands on you?

"A. I kept reminding him that we were divorced, and that, you know, he just— he didn't need to ruin everybody's life, and I said, you know, what he was doing wasn't right, and I just wanted him to leave, it wasn't going to change anything between him and I.

"Q. Did you make it clear to him that this was not something you wanted to do?

"A. Yes.

"Q. How did you—how do you know that you were clear about that?

"A. Because I said—I said, 'I don't want to do this.' I said, 'This is against my will.' He said he didn't have a problem with that.

"Q. Did you—well, after you communicated that to him, did he continue?

"A. Yeah. He—he insisted that I be the one [to] take my underwear off, and I didn't at his first request, but he started getting agitated, then I did.

"Q. Once that happened, what happens next?

"A. He took his pants off and he put a condom on, and I just—I sat down in the chair, and he came up to me and went inside me, and he just held onto my legs, and then he was finished, and —

"Q. Now, when you say he finished, what does he do?

"A. He just backs away, and he goes to the bathroom and flushes the condom."

To clarify the scene even further, I must point out that Brooks came to her house, announced his intentions of obtaining sex from her, or else, even though their children were upstairs. He then waited around downstairs until his former wife put their youngest child to bed. Confronted with an agitated, threatening man, with her young, vulnerable children just upstairs, this woman was in a terrible predicament. Who can say this man did not force himself upon this woman for sexual intercourse?

Our Supreme Court recognizes such questions are questions of fact for a jury to determine if a victim is overcome by force or fear, for such questions do not lend themselves to definition as a matter of law. See *State v. Borthwick*, 255 Kan. 899, 909-14, 880 P.2d 1261 (1994). Constructive force has been defined as threats and intimidation used to gain control or prevent resistance. Black's Law Dictionary 717 (9th ed. 2009). Brooks used such psychological or emotional force to overcome his former wife's resistance. I believe the jury in this case had enough evidence of force and fear that a rational fact finder could find beyond a reasonable doubt that Brooks was guilty of rape.

Looking deeper, the *Borthwick* court clarified the concepts of force and fear in the context of a rape prosecution. Concerning force, the key is the jury's determination whether the victim *was overcome*:

"The 'force' required to sustain a rape conviction in this state does not require that a rape victim resist to the point of becoming the victim of other crimes such as battery or aggravated assault. K.S.A. 21-3502 does not require the State to prove that a rape victim told the offender she did not consent, physically resisted the offender, and then endured sexual intercourse against her will. It does not require that a victim be physically overcome by force in the form of a beating or physical restraint. It requires only a finding that she did not give her consent and that *the victim was overcome* by force or fear to facilitate the sexual intercourse." (Emphasis added.) 255 Kan. at 914.

Then, when considering the use of fear, the court emphasizes the subjectivity of this finding for the jury:

"Fear in and of itself is inherently subjective. Unless otherwise limited in the statutory definition . . . a finding that a particular victim is overcome by fear does not require proof that it is fear induced by threat of force that would prevent resistance by a reasonable person. What renders one person immobilized by fear may not frighten another at all. The reasonableness of a victim's claim that she was overcome by fear necessarily enters into the factfinder's determination about whether the victim is telling the truth. . . .

. . . .

". . . Under Kansas law, when a victim testifies that she was overcome by fear, and her testimony is not " 'so incredible as to defy belief,' " [citation omitted], there is sufficient evidence to present the ultimate determination to the factfinder. The reasonableness of a particular victim's fear may affect the jury's assessment of the victim's credibility in arriving at its verdict." *Borthwick*, 255 Kan. at 913-14.

We are duty bound to follow the guidance given by our Supreme Court. See *State v. Jones*, 44 Kan. App. 2d 139, 142, 234 P.3d 31 (2010), *rev. denied* 292 Kan. 967 (2011). I think my colleagues disregard the lessons offered by *Borthwick*.

I fear the unintended consequences of the majority's ruling. It hearkens back to the days when prosecutors would not file a rape case unless the victim had visible bruising, torn clothing, scratches and abrasions on her body, and at least one or two broken fingernails from her vain efforts to fight off her assailant. The majority's disregard of psychological or emotional force could lead just to that

reaction. Rape is all about the illegal imposition of power over a victim; that is an overcoming of will with force or fear. Clearly, the words found in this trial transcript are pale symbols when compared with the live testimony given before a jury. For example, we have no idea of the stature of Brooks compared to that of his former wife. His mere presence may be intimidating to her. I must point out that Brooks acted as his own counsel for much of this trial and cross-examined his victim in this case. I cannot tell what tone of voice he used or what mannerisms he employed during his probing questioning of her, but his jury did see and hear them. We, from this remote perch, cannot tell such things and that is the point. A jury would have seen all that. A jury could have heard the tremor in her voice, if there was one. We cannot.

I would affirm Brooks' conviction of the rape of his former wife.

I do agree that Brooks cannot be convicted of breach of privacy under the limitations set out in K.S.A. 21-4002 and that conviction must be overturned.