REPORTED

IN THE COURT OF SPECIAL APPEALS
OF MARYLAND

No. 2413

September Term, 2010

CHARLES BRANDON MARTIN

v.

STATE OF MARYLAND

Krauser, C.J.,
Graeff,
Hotten,

JJ.

Opinion by Krauser, C.J.

Filed: July 30, 2014

Convicted, after a jury trial in the Circuit Court for Anne Arundel County, of attempted first-degree murder,[1] Charles Brandon Martin, appellant, presents seven issues for our review. Divested of argument, they are:

I.  Whether the circuit court erred in failing to suppress text message evidence obtained by law enforcement officers from the victim's cell phone;

II.  Whether the circuit court erred in allowing a State's DNA expert to testify regarding the results of DNA tests she did not personally perform;

III.  Whether the circuit court erred in not requiring the State to provide the defense with a bill of particulars after the State purportedly changed its prosecution theory;

IV.  Whether the circuit court erred in finding that there was sufficient evidence to convict appellant of attempted first-degree murder;

V.  Whether the circuit court erred in instructing the jury that appellant was charged with being an accessory before the fact rather than an aider and abettor;

VI.  Whether the circuit court erred in accepting purportedly inconsistent verdicts; and

VII.  Whether the circuit court erred in considering evidence of a letter allegedly written by appellant and then

---

[1]Martin was charged with (I) attempted first-degree murder; (II) attempted second-degree murder; (III) first-degree assault; (IV) second-degree assault; (V) use of a handgun in the commission of a felony; (VI) use of a handgun in the commission of a crime of violence; (VII) carrying a handgun; (VIII) reckless endangerment; (IX) conspiracy to commit first-degree murder; and (X) solicitation to commit murder. With the exception of counts I and X, all other charges were ultimately either nol prossed or were lesser included offenses subsumed within the charge of attempted first-degree murder. He was acquitted of solicitation to commit murder.

purportedly sentencing appellant for a crime of which he had been acquitted.

After argument before this Court, the parties filed a joint motion to stay any further action by this Court, until *Williams v. Illinois*, No. 10-8505, had been decided by the Supreme Court, and *Dzikowski v. State*, No. 15, September Term, 2011, by the Court of Appeals, as those pending decisions might affect the resolution of the issues presented in the instant case. Because those cases did, in fact, involve many of the same issues presented by this appeal, we granted their motion and deferred a decision in this matter.

Subsequently, the Supreme Court rendered a decision in *Williams*, 567 U.S. __, 132 S. Ct. 2221 (2012), as did the Court of Appeals in *Dzikowski*, 436 Md. 430 (2013). We therefore now consider the issues raised by this appeal in light of those decisions.[2]

## FACTS[3]

On October 27, 2008, Jodi Lynne Torok, the victim, was found at her home in Crofton, Maryland, with a gunshot wound to her head. Having survived that wound, the victim testified, at the trial below, that she had been in a romantic relationship with Martin, who was married to someone else, and that about eight or nine weeks before the shooting, she had become pregnant with his child. After the victim informed Martin of her condition,

_____

[2]Neither party has requested an opportunity to re-brief the issues presented in *Williams* or *Dzikowski*, nor do we find it necessary for them to do so.

[3]As required by Maryland law, we are presenting the facts in a light most favorable to the State, as the prevailing party below. *See*, *e.g.*, *Davis v. State*, 207 Md. App. 298, 303 (2012).

he angrily demanded that she obtain an abortion. Although she had, at first, agreed to do so, she later changed her mind and decided to have the baby. Upon informing Martin of her change of mind, the victim advised him of her intention "to go to court and take him for child support." Predictably, that advisement led to cooling of their relationship.

Subsequently, on the day of the shooting, at about 3:00 p.m., the victim was talking on the phone, at her home, with a close friend, Blair Wolfe,[4] when a man, purporting to be a salesman, knocked on her front door. She then ended the call to respond to the "salesman," but thereafter never called Ms. Wolfe back or answered any of Wolfe's subsequent telephone calls. Growing increasingly concerned but unable to take any action on her own,[5] Ms. Wolfe telephoned Jessica Higgs, the victim's roommate, and requested that she leave work and return home to make sure that the victim was safe. Upon arriving at the residence that she shared with the victim, Ms. Higgs found the front door unlocked and the victim lying on the foyer, unconscious and bleeding from a gunshot wound to her head. Higgs immediately called "911."

When the first police officer arrived at the victim's residence, he secured the scene. Then, upon entering the residence, he found the victim, Ms. Torok, "laying in the doorway," "fully clothed," still breathing, but unresponsive. There were no signs of forcible entry or that the victim's personal property had been disturbed.

_____

[4]At other parts of the record, her name is spelled "Blaire Wolfe." We adopt the spelling used in the State's discovery disclosure. Ms. Wolfe did not testify at Martin's trial.

[5]At the time of this telephone call, Ms. Wolfe was living in Pittsburgh.

When paramedics arrived at the scene, they transported the victim to the Shock Trauma Center at the University of Maryland Hospital in Baltimore City, where she remained for nearly a month. As a result of the gunshot wound, the victim's pregnancy was terminated, and she suffered severe and disabling injuries. Neither during that time nor thereafter could she recall the events that took place, from the end of her telephone conversation with Ms. Wolfe on October 27th until Thanksgiving, one month later.

The evidence recovered by the police at the scene of the shooting included a Gatorade bottle, which appeared to be fashioned into a home-made silencer;[6] a spent projectile as well as a spent shell casing; and the victim's Blackberry cell phone.

### Gatorade bottle/silencer

From the Gatorade bottle, police evidence technicians extracted "a human hair" of "Negroid origin"[7] and saliva from the mouth of the bottle. DNA testing of both linked the bottle to Martin.[8]

---

[6]The mouth of the Gatorade bottle was wrapped with two layers of tape, and at the bottom of the bottle was a hole. The tape exhibited a distinct, rectangular shape, a shape suggesting that the mouth of the bottle had been pressed against the barrel of a semi-automatic handgun. Furthermore, sooty residue lined the bottle's inside surface at the location of the hole, indicating that that opening at the bottom of the bottle had been made by an exiting bullet. It appeared, to police, to be a home-made silencer.

[7]Martin is an African-American male.

[8]Martin's mitochondrial DNA profile was the same as that derived from the hair strand. One of the State's expert witnesses testified at trial that only about 0.06 per cent of the population of North America shares the same mitochondrial DNA profile as that derived from the hair fragment found on the Gatorade bottle.

(continued...)

4

The victim testified that neither she nor Ms. Higgs drank Gatorade, but that Martin did and often.[9] Martin's fondness for Gatorade was later confirmed by the officer who drove him to the Anne Arundel police station, who testified that, on the way to the station, he and Martin stopped at a convenience store, where Martin purchased a bottle of Gatorade to drink.

Granted immunity from prosecution for the shooting and possibly for other unrelated charges, Michael Bradley testified that, on the day of the shooting, he; his brother, Frank Bradley; Martin; and Jerry Burks, an acquaintance of Martin, were together at Maggie McFadden's house "about noon" and that he observed Frank Bradley carrying "some white . . . medical tape" and a Gatorade bottle upstairs to McFadden's bedroom, where he was joined by Martin. Then, according to Michael Bradley, Martin and Burks left together, "approximately 1:30, 2:00" p.m., and returned after 3:00 p.m. but before 6:30 p.m. the same day.[10]

---

[8](...continued)
DNA testing of a swab of saliva taken from the mouth of the bottle revealed that it contained "a mixture of DNA from at least three individuals," at least one of whom was female and another a male. The test results excluded "approximately 94 percent of the Caucasian population," as well as "approximately 96 percent of the African-American population," but among the males, who could not be excluded, was Martin. And, among the females, who could not be excluded, was the victim, Jodi Torok.

[9]The victim stated that Martin drank Gatorade "a lot."

[10]The State's theory was that Burks was the shooter and that he had been solicited by Martin. Burks was tried separately, six months before Martin's trial, on charges that included attempted first- and second-degree murder and conspiracy to commit murder. He was acquitted by a jury on all counts. Five days before Martin's trial, the State moved in limine to "exclude from trial any evidence that Jerold Burks was acquitted of the charges" in that
(continued...)

5

Finally, Sheri Carter, one of Martin's former girlfriends,[11] testified that Martin, approximately one month before the shooting, while at her residence, used a computer to conduct internet research on how to assemble a home-made silencer. She further stated that, during the first week of November 2008, approximately one week after the shooting and shortly after Martin had been questioned by police, Martin took the computer from her apartment, telling her "that [they] had looked up so many crazy things on the internet that in case [Carter's] apartment got searched [Martin] didn't want it found there." Martin, in her words, then "got rid of" the computer.

### *Ballistic evidence*

The bullet recovered by police, a .380 caliber bullet, and the shell casing that was found, could have been fired, according to a State's expert witness, from a semi-automatic firearm. Such a firearm could have been manufactured by any one of sixteen different manufacturers, which was consistent with Martin's purchase, in 2003, of two .380 caliber semi-automatic handguns made by Bryco Arms, one of those sixteen manufacturers.[12] Moreover, Sheri Carter testified that, in September and October of 2008, the time period just

---

[10](...continued)
case, and, on the day trial commenced, the court granted that motion. Thereafter, the State nol prossed the conspiracy charge against Martin.

[11]In addition to his wife, Martin had at least three girlfriends with whom he maintained intimate relations.

[12]The parties stipulated that, in 2004, one of those handguns "was transferred to another party."

before the shooting, she had observed Martin carrying a "small, silver, [black-handled], semi-automatic" handgun.

The firearm itself was never found. The testimony of Michael Bradley suggested why that was so. According to Michael Bradley, when Martin returned to McFadden's home the evening of the shooting, he saw Martin give a brown paper bag to Frank Bradley and tell Bradley to "get rid of this."

### Victim's cell phone

Finally, the last of the four items found at the victim's residence was her Blackberry cell phone. Text messages extracted from that phone by police confirmed that Martin had exchanged several text messages with the victim on the day of the shooting.[13]

### Martin's statement

The day after the shooting, Martin gave a statement to police. During the interrogation, Martin downplayed his relationship with Ms. Torok, the victim, telling detectives that he did not know her last name and that he was unsure where she lived, but he conceded that he had previously been to her house. And, although he was "highly doubt[ful]" that he was the father of the victim's baby, since they "hadn't had any contact," he admitted to police that he had agreed to provide money to her to "help her out." Finally, Martin claimed that, on the day of the shooting, he was at home with his wife and children

---

[13]Police technicians used a device known as a universal memory exchanger ("UME"), that extracts the data stored on a cell phone, including text messages.

7

until mid-day and that later he had visited "Frankie" and "Mike" Bradley, who were friends of his, arriving at "around" 1:00 p.m., staying with them until about 4:30 p.m., and then returning home.

## DISCUSSION

## I.

Martin contends that the circuit court erred in denying his motion to suppress text messages retrieved by police from the victim's cell phone, in violation of the Maryland Wiretap Act, Maryland Code (1974, 2006 Repl. Vol.), § 10-401 *et seq.* of the Courts & Judicial Proceedings Article ("CJP").[14] Specifically, Martin claims that, in reading and, later, recording the text messages from the victim's Blackberry cell phone, the police had "intercepted" those text messages and were therefore required, in accordance with the strictures of the Maryland Wiretap Act, to apply for a court order before doing so, which they

---

[14] Martin does not invoke the Fourth Amendment, presumably because he lacks standing to challenge a warrantless search of another person's cell phone. *Rakas v. Illinois*, 439 U.S. 128, 133-34 (1978) ("'Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted.'") (quoting *Alderman v. United States*, 394 U.S. 165, 174 (1969)). Under the Maryland Wiretap Act, he would, assuming that there was an "interception," qualify as an "aggrieved person," that is, "a person who was a party to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed." Md. Code (1974, 2006 Repl. Vol.), Courts and Judicial Proceedings Article, § 10-401(10) ("CJP").

During the pendency of this appeal, the Maryland Wiretap Act was amended several times. The quoted definition now appears at CJP § 10-401(1). Unless otherwise stated, all statutory references in this opinion are to the versions of the statutes that were in effect at the time of the crime.

did not do. CJP § 10-406(a). Furthermore, the State's use of evidence derived from those text messages, maintains Martin, violated the Maryland Stored Communications Act, CJP § 10-4A-01 *et seq.*

When the police arrived at the victim's residence, they found, inside her home, her cell phone. Text messages that were later extracted, by law enforcement personnel, from that phone showed, among other things, that Martin and the victim had exchanged several text messages on the day of the shooting. At 8:23 a.m. on the day of the shooting, Martin sent the victim a text message asking, "What time do u work[?]" Less than a minute later, the victim replied, "I'm off." At 9:29 a.m., an hour later, the victim, having received no reply from Martin, sent another text message, stating, "Hello." But that greeting elicited no response from Martin until 5:11 p.m., a little more than two hours after the shooting, when he sent a message stating, "I got some stuff with the kids to about 7 so any time after how much did u need[?]"

Based in part on the text messages retrieved from the victim's cell phone and in part on Martin's own cell phone text messages, search warrants were obtained for Martin's home and vehicle; for Maggie McFadden's home; for Jerry Burks's home and computer; as well as for samples of Martin's saliva and hair. Among the items recovered, upon the execution of those warrants, were Martin's saliva and hair samples, as well as a roll of white medical tape, from McFadden's home, that, in the words of a State expert, "exhibited the same characteristics as" the medical tape found on the home-made Gatorade silencer.

9

Before trial, Martin filed a "motion to suppress wiretap," contending that the police had violated the Maryland Wiretap Act by "unlawfully intercept[ing]" the text messages from the victim's cell phone and requesting that the court "suppress the contents of any intercepted wire, oral or electronic communication and evidence derived therefrom." After several hearings were held, the circuit court declined to suppress the text messages recovered from the victim's cell phone, holding that the retrieval of those messages did not violate the Maryland Wiretap Act.[15] It also declined to suppress any derivative evidence, declaring that, even if all of the references to both the victim's and Martin's cell phone text messages had been deleted from the warrant affidavits, there was still probable cause to issue a search warrant for, among other things, Martin's saliva and hair samples.

The Maryland Wiretap Act states that it is "unlawful for any person to . . . [w]illfully intercept, endeavor to intercept, or procure any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication."[16] CJP § 10-402(a)(1). It defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device," CJP § 10-401(3), and describes an "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or

---

[15]The circuit court granted Martin's motion in part, ordering the suppression of all text messages that the police had obtained from Martin's cell phone service provider.

[16]CJP § 10-402(c) sets forth a detailed list of acts that are "lawful" under the Maryland Wiretap Act, including a number of exceptions to the prohibition under subsection (a)(1), but none of these exceptions is applicable to the instant case.

10

in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system." CJP § 10-401(11).[17]

Although there are no Maryland appellate decisions[18] that have specifically construed the term "intercept," there are a number of federal appellate decisions that have, under the Federal Wiretap Act, 18 U.S.C. § 2510 *et seq.*, the federal analogue of the Maryland Wiretap Act. In language that is largely mimicked by the Maryland statute,[19] the federal act provides that "any person who intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication" commits a crime and is further subject to civil suit. 18 U.S.C. § 2511(1)(a). Both acts define "intercept" and "electronic communication" in nearly[20] identical terms. *Compare* 18 U.S.C.

[17]The quoted definitions now appear at CJP § 10-401(10) and (5), respectively (the latter with slight changes that are not relevant to our analysis).

[18]During the pendency of this appeal, the Court of Appeals decided *Davis v. State*, 426 Md. 211, 218 (2012), which held that the "interception of a wire, oral, or electronic communication, for the purposes of the Maryland wiretap statute, occurs where law enforcement officers capture or redirect first the contents of the communication overheard by the wiretap and where they heard originally the communication." In that case, however, it was undisputed that an "interception" had occurred, *id.* at 213-14, and the Court had no need or reason to specifically consider the question of what constitutes an "interception." There, it was only concerned with the issue of where that interception took place for jurisdictional purposes. *Id.* at 214.

[19]The Maryland statute provides, among other things, that "it is unlawful for any person to . . . [w]illfully intercept, endeavor to intercept, or procure any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication." CJP § 10-402(a)(1).

[20]"Intercept" is defined identically in both the Maryland and Federal Wiretap Acts, but
(continued...)

11

§ 2510(4) and (12) *with* CJP § 10-401(3) and (11) (defining, respectively, "intercept" and "electronic communication"). *See also Davis v. State*, 426 Md. 211, 220 & n.3 (2012) (observing that definitions of "intercept" in Maryland and Federal Wiretap Acts are "identical[].").  We therefore turn to the pertinent federal appellate decisions interpreting those terms for guidance. *Id.* at 223.

We begin with *Steve Jackson Games, Inc. v. United States Secret Service*, 36 F.3d 457 (5th Cir. 1994). There, the United States Court of Appeals for the Fifth Circuit held that the seizure of a computer, in which were stored private e-mail messages sent from remote computers but not as yet read by their intended recipients, was not an "intercept" of those messages under the federal act, though they were clearly "electronic communications." In addressing the question of what constituted an "intercept" of "electronic communications" at that time, the federal appellate court observed that there was a "[c]ritical" difference in the definitions of two categories of communication, "wire communication" and "electronic communication," both of which fell within the federal statutory prohibition against unlawful "interception": Both categories of communication included the "transfer" of information, but a "wire communication" further encompassed "any electronic storage of such communication," (which it no longer does, as we shall later explain), while "electronic communication" did not. *Steve Jackson Games*, 36 F.3d at 461. This textual difference, the

<hr>

[20](...continued)
"electronic communication" is not.

Fifth Circuit believed, evidenced a Congressional intent that the term "intercept" be applied to "electronic communication[s]" only when those communications are in transit and not when they are in electronic storage. *Id.* at 461-62. Because the electronic communications at issue in *Steve Jackson Games* were in storage when Secret Service agents obtained them, the Fifth Circuit held that there had been no "interception" of them. *Id.*

Other federal appellate courts have subsequently adopted this construction of "intercept." For example, in *Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868 (9th Cir. 2002), the United States Court of Appeals for the Ninth Circuit, applying *Steve Jackson Games*, held that an "interception" under the Federal Wiretap Act had not occurred when an employer, using a third-party's password, obtained access to messages stored on a secure website maintained by one of its employees. The Ninth Circuit suggested that the enactment of the "PATRIOT" Act,[21] which amended the Federal Wiretap Act,[22] evidenced Congress's intent that the term "intercept" be narrowly defined. In passing the PATRIOT Act, Congress, explained the Ninth Circuit, had "essentially reinstated the [narrow] definition of 'intercept'—acquisition contemporaneous with transmission—with respect to wire communications." *Id.* at 878. The federal appellate court therefore concluded that the Federal Wiretap Act did not apply where the acquired communications were in storage at the

---

[21]Pub. L. 107-56, 115 Stat. 272.

[22]The PATRIOT Act amended the Federal Wiretap Act by leaving the definition of "intercept" intact as it applied to "electronic communication" but then deleting the reference to electronic storage from the definition of "wire communication." *See* Pub. L. 107-56, § 209(1)(A), 115 Stat. 283.

time of their acquisition. *Accord United States v. Steiger*, 318 F.3d 1039 (11th Cir. 2003) (holding that anonymous informant who hacked into the accused's computer to retrieve images of child pornography did not, under the Federal Wiretap Act, "intercept" those images because she did not acquire them during their transmission).[23]

Prior to 2002, the Maryland Wiretap Act defined "wire communication" to include "any electronic storage of a communication as described in this paragraph," just as the Federal Wiretap Act did before the enactment of the PATRIOT Act. *See* Md. Code (1974, 1998 Repl. Vol.), § 10-401(1)(ii) of the Courts & Judicial Proceedings Article. But, in 2002, the General Assembly enacted the Maryland Security Protection Act of 2002, which, among other things, altered the definition of "wire communication" in the Maryland Wiretap Act so that it would no longer include electronic storage, thereby tracking the change in definition

[23]We do not consider, in this case, the interception of messages transmitted over packet-switched communications networks. Such networks, which are today in widespread use in cell phone and internet communications, rely upon subdivision of a digital message into smaller "packets," each of which is sent separately and independently (and perhaps over a different pathway) and ultimately re-assembled into the original message upon the arrival of all of the packets at their destination. While those packets are in transit, they may be stored, very briefly, on high-speed switching devices, known as "routers," which serve as intermediate destinations for network traffic. *In United States v. Szymuszkiewicz*, 622 F.3d 701 (7th Cir. 2010), and *United States v. Councilman*, 418 F.3d 67 (1st Cir. 2005), the First and Seventh Circuits have concluded that the Federal Wiretap Act "applies to messages that reside briefly in the memory of packet-switch routers." *Szymuszkiewicz*, 622 F.3d at 706. But, as *Szymuszkiewicz* explains, such "packets" are nonetheless in transit, and, since the entire process from start to finish occurs in at most seconds, the acquisition of "packets" from routers is essentially "contemporaneous" with transmission. *Id.* Here, in contrast, the messages at issue had been received hours before the police had obtained access to them, and their storage, for an indefinite duration, on the victim's cell phone, is of an entirely different character than the transient storage of "packets" in the memory of routers during transit.

14

adopted in the PATRIOT Act and, in effect, narrowing the scope of the term "intercept." 2002 Md. Laws, ch. 100, at 1271-72.

In light of the nearly identical definitions of "intercept" and "electronic communication" in both the Federal and Maryland Wiretap Acts, as well as the fact that Maryland has adopted the same narrow definition of "wire communication" that first appeared in the PATRIOT Act, we shall join the federal courts in construing "intercept" as requiring "acquisition contemporaneous with transmission" of the messages. *Konop*, 302 F.3d at 878. That is to say, an "intercept" does not occur when, conversely, the electronic communication was in storage at the time of acquisition.[24] We therefore conclude that the police, in the instant case, did not unlawfully "intercept" text messages from the victim's cell phone, as those messages were, at the time of their seizure, already stored in that phone, having already been sent and received before police gained access to them.

The Maryland Wiretap Act, moreover, prohibits only interceptions that occur "through the use of any electronic, mechanical, or other device." CJP § 10-401(3). Since a cell phone is not a "device," under the Wiretap Act, as it specifically excludes "telephone" from the statutory definition of "electronic, mechanical, or other device," *see id.* § 10-401(4),

---

[24]"Storage," as stated here, does not include transient storage "in the memory of packet-switch routers." *Szymuszkiewicz*, 622 F.3d at 706. As that issue is not before us, we offer no opinion as to whether we would follow the First and Seventh Circuits in their application of the Federal Wiretap Act to transient storage.

messages found in the victim's cell phone are not covered by the Act and therefore are not subject to exclusion under the strictures of the Act.

That the data was subsequently transferred onto a police department computer by means of a universal memory exchanger ("UME") is of no consequence, because the data at issue was already in the possession of police investigators before its transfer via the UME. As a consequence, even if we assume that the UME is a "device," as Martin contends, it was not used to "intercept" the text messages. Rather, the UME was used to record the data after it had already been lawfully acquired. *See United States v. Harpel*, 493 F.2d 346, 350 (10th Cir. 1974) (holding that "the recording of a conversation is immaterial when the overhearing is itself legal").

Finally, contrary to Martin's claim, the Maryland Stored Communications Act provides neither a rationale nor remedy for excluding as evidence the information obtained from the victim's cell phone (as well as any derivative evidence). The Stored Communications Act forbids "obtain[ing] . . . access to a wire or electronic communication while it is in electronic storage in an electronic communications system by (1) [i]ntentionally accessing without authorization a facility through which an electronic communication service is provided; or (2) [i]ntentionally exceeding an authorization to access a facility through which an electronic communication service is provided." CJP § 10-4A-02(a). That prohibition, however, does not apply to the victim's cell phone, which is not a "facility through which an electronic communication service is provided," but presumably to the

16

network infrastructure (such as the cell phone tower, its transmitters, and servers and switches), which is managed and operated by cell phone service providers.

Even if there were a violation of the Maryland Stored Communications Act, exclusion of evidence, obtained by that violation, is not an appropriate remedy. During the pendency of this appeal, we were presented with this very issue, and we held that, given the absence of a statutory exclusionary rule in the Maryland Stored Communications Act, we would "not create a suppression remedy" where none existed. *Upshur v. State*, 208 Md. App. 383, 399 (2012), *cert. denied*, 430 Md. 646 (2013).

## II.

Relying upon *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009), Martin contends that the circuit court's admission of the testimony of Terry Melton, Ph.D., one of the State's DNA experts, regarding the results of mitochondrial DNA testing, violated the Confrontation Clause of the Sixth Amendment because she had not personally performed that testing. In *Melendez-Diaz*, the Supreme Court held that the Confrontation Clause had been violated when a trial court allowed the prosecution to introduce into evidence test reports, purporting to establish that a substance seized from the accused was cocaine of a specified weight, without the testimony of anyone who performed the underlying tests, leaving the accused without anyone to cross-examine as to the accuracy of those reports.[25]

---

[25]The Supreme Court rejected the Commonwealth's argument that Melendez-Diaz could have subpoenaed the analysts, observing that the subpoena power "is no substitute for
(continued...)

17

We must first determine whether this issue was preserved for our review. The State contends that it was not and we agree, for the following reasons:

Maryland Rule 5-103(a)(1) provides that "[e]rror may not be predicated upon a ruling that admits . . . evidence unless the party is prejudiced by the ruling, and . . . a timely objection or motion to strike appears of record[.]" Such an objection, according to Maryland Rule 4-323(a), "shall be made at the time the evidence is offered or as soon thereafter as the grounds for objection become apparent. Otherwise, the objection is waived."

After the State had completed its direct examination of Dr. Melton, Martin, during cross-examination of the doctor, objected to the admissibility of her testimony on Confrontation Clause grounds and moved "to strike all of it." This objection led to an extended bench conference, during which the parties disagreed over the applicability of *Melendez-Diaz*, which, at that time, was the most recent Supreme Court decision addressing the scope of the Confrontation Clause. That conference was, in turn, followed by a brief recess to afford the court and counsel the opportunity to research the question further.

When the bench conference resumed, the State propounded a new claim, namely, that Martin's belated objection had resulted in waiver of his Confrontation Clause claim. That claim prompted a shift in the focus of the bench conference from the *Melendez-Diaz* issue

[25](...continued)
the right of confrontation" and that "fundamentally, the Confrontation Clause imposes a burden on the prosecution to present its witnesses, not on the defendant to bring those adverse witnesses into court." *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 324 (2009).

to the discovery materials that had been provided to Martin.  After examining those materials, the circuit court made a preliminary finding that those documents had, indeed, "put[]" Martin "on notice that there was a technician other than [Dr.] Melton involved in the case."  Having made that tentative finding, the court felt impelled to warn Martin's counsel that it was "going to find waiver" unless he could "come up with something that show[ed]" otherwise. The court then recessed for the weekend.

Upon reconvening on Monday morning, the circuit court, after entertaining additional argument, found that Martin's counsel had "received in discovery," and well before trial had begun, "a clear indication" that Dr. Melton "was not the technician who did the original lab work"; and furthermore had been "put on notice by" Dr. Melton's "earlier" testimony that others had performed that work and yet "did not object."  The court therefore concluded that Martin had waived his objection and then denied his motion to strike Dr. Melton's testimony.

That ruling, we cannot say, was clearly erroneous.  The discovery materials provided by the State to Martin's counsel gave Martin, in the words of the court, "a clear indication" that Dr. Melton had not performed the laboratory work.[26]  Nor can we say that Dr. Melton's

---

[26]At a minimum, the following documents should have alerted Martin that Charity A. Holland, M.P.H., the "Quality Manager" at Mitotyping Technologies, LLC, and perhaps other technicians, actually performed the "bench work" necessary to test the hair sample: An electronic document in the discovery materials, entitled "TECHNICAL REVIEW: Mitochondrial DNA Case File 2910," is signed, not by Dr. Melton, but by Ms. Holland. That review is a checklist of twenty-five specific procedures that were to be followed, according to Mitotyping Technologies laboratory protocols (which were separately included in the discovery materials), followed by handwritten checkmarks indicating that they had been
(continued...)

19

"earlier" testimony did not, as the circuit court found, put Martin on further notice that technicians other than Dr. Melton had actually performed the laboratory work.[27]  Therefore, in accordance with Maryland Rules 4-323(a) and 5-103(a)(1), the court below did not err in ruling that Martin's counsel had waived his objection.  *See Melendez-Diaz*, 557 U.S. at 314 n.3 (observing that "[t]he right to confrontation may . . . be waived, including by failure to object to the offending evidence; and States may adopt procedural rules governing the exercise of such objections").

In his reply brief, Martin contends, as an alternative ground for reversal, that his trial counsel was ineffective in failing to lodge below a timely "Confrontation" objection to Dr. Melton's testimony.  This issue is not properly before us, however, as Martin failed to raise

---

[26](...continued)
satisfactorily performed.  In fact, since Ms. Holland herself signed that report as the "Reviewer," it cannot even be assumed that she, let alone Dr. Melton, had actually performed those routine tasks.  Furthermore, Ms. Holland co-signed, with Dr. Melton, a letter dated March 26, 2009, addressed to Anne Arundel evidence coordinator Craig Robinson, summarizing the test results and concluding that Martin "and his maternal relatives are not excluded as the contributor of" the hair fragment.

[27]For example, Dr. Melton described the procedures followed after evidence is received: "When evidence comes to our laboratory, . . . **we have two people who receive** the evidence, who sign it in, who fill out a form that delineates where it came from, who sent it, and what exactly it is, including what it looks like such as labeling on the outside of the package, we take photographs of it, and then we package it with our own evidence tape on it, our own initials, dates, and so forth, and then it's stored in locked cupboards or cabinets until the time it's tested."  Later, when describing the testing procedures followed in this specific case: "This is a package with [Mitotyping] Technologies evidence  -- tamper proof evidence tape with our case number 2910, the label K1, which indicates that it was the K standing for known, the first known sample and **initialed and dated by one of our staff members**."  (Emphasis added.)

20

it in his initial brief. *Williams v. State*, 188 Md. App. 691, 703 (2009) (observing that function of reply brief is limited and that it may not be used to raise issues not previously raised in initial brief), *aff'd*, 417 Md. 479, *cert. denied*, 565 U.S. __, 132 S. Ct. 93 (2011). In any event, a claim of ineffective assistance of counsel is, ordinarily, more appropriately addressed in a post-conviction proceeding, because that proceeding affords an opportunity for an evidentiary hearing and a chance for defense counsel to explain what may have been a tactical reason for his belated objection. *Mosley v. State*, 378 Md. 548, 558-62 (2003).

## III.

Martin claims that the trial court erred in denying his exceptions to the State's refusal to provide a bill of particulars and that, as a result, he was forced to defend himself without knowing whether the State was claiming that he was a principal in the first degree, an aider and abettor, or an accessory before the fact. He further asserts that, because of this uncertainty, he was unfairly surprised when, during the trial, the State purportedly changed its theory of the case, from alleging that he accompanied the shooter to the victim's house to asserting that he was at McFadden's house at the time of the shooting, and that it was there that he prepared the homemade silencer used in that attack. He therefore maintains that he was unfairly prejudiced by the denial of his request for a bill of particulars and, as a consequence, denied due process of law. We find no merit to this claim.

Several months before the scheduled trial date and a year before Martin's trial ultimately took place, Martin filed a demand for a bill of particulars, "pursuant to Maryland Rule 4-241,"[28] as to all counts of the indictment. The demand directed the prosecution to:

> 1. State with particularity the exact time and place where the alleged offense occurred.
>
> 2. State with particularity what facts the State will prove to show the Defendant did commit the alleged offense.

---

[28]Maryland Rule 4-241 provides:

> (a) **Demand.** Within 15 days after the earlier of the appearance of counsel or the first appearance of the defendant before the circuit court pursuant to Rule 4-213(c), the defendant may file a demand in circuit court for a bill of particulars. The demand shall be in writing, unless otherwise ordered by the court, and shall specify the particulars sought.
>
> (b) **Response to Demand.** Within ten days after service of the demand, the State shall file a bill of particulars that furnishes the particulars sought or it shall state the reason for its refusal to comply with the demand.
>
> (c) **Exceptions to Response.** The defendant may file exceptions to the sufficiency of the bill of particulars or to any refusal or failure to comply with the demand. The exceptions shall be filed within ten days after service of the response to the demand or, if no response is filed, within ten days after the time within which a response should have been filed. The circuit court may rule on the exceptions without a hearing.
>
> (d) **Amendment.** On motion of the State, the court may permit a bill of particulars to be amended at any time subject to such conditions as justice requires.

3. State with particularity the facts the State will prove to show the alleged offense was committed.

4. State with particularity the manner and means with which the Defendant did commit the alleged offense.

5. **State with particularity if Defendant is charged with the alleged offense as a principal in the first degree or as a principal in the second degree.**

6. **State with particularity all facts the State intends to prove that show Defendant acted as a principal in the first degree or as a principal in the second degree.**

(Emphasis added.)

Two weeks later, Martin moved to dismiss the indictment, alleging that it "fail[ed] to sufficiently characterize the offenses in order to enable the Defendant to prepare a defense." Five months later, having not received a response to his demand for a bill of particulars, Martin filed exceptions, insisting that, "[i]n view of the nature of the offenses charged in the above-captioned case, it is essential to the preparation of the defense in this matter that the State's Attorney's Office comply forthwith with the Demand for Particulars." Two weeks after that, the State filed an opposition to Martin's demand for particulars, contending that it had "given open file discovery" to Martin and that, as the discovery process had been "transparent," there was "no chance" that the indictment was so general that it failed to disclose "sufficient information to afford" Martin "a fair and reasonable opportunity to defend himself." In fact, Martin's demand for particulars was, asserted the State, nothing more than "a surreptitious attempt" to force the State to disclose its "legal theories" and

thereby "box the State in at trial." That being so, it urged the circuit court to deny Martin's request.

A hearing was subsequently held on, among other things, Martin's motion to dismiss the indictment and his exceptions to the State's response to his demand for a bill of particulars. At the conclusion of that hearing, the circuit court overruled Martin's exceptions and denied his motion to dismiss the indictment, concluding that Martin's trial counsel had "to defend against everything," that is, against the possibility that Martin was the shooter, as well as "the solicitor of the crime."

"[B]ills of particulars are intended to guard against the taking of an accused by surprise by limiting the scope of the *proof*," *Hadder v. State*, 238 Md. 341, 351 (1965), and, ultimately, ensure that an accused's constitutional rights "to be informed of the accusation against him and . . . to prepare for his defense" are protected. *Seidman v. State*, 230 Md. 305, 312 (1962). But a bill of particulars is meant "to secure facts, not legal theories." *Hadder*, 238 Md. at 351 (quoting *Rose v. United States*, 149 F.2d 755, 758 (9th Cir. 1945)). Indeed, an accused is "not entitled to make the prosecution select and state its theory of the case." *Id.*

During the pendency of this appeal, the Court of Appeals decided *Dzikowski v. State*, 436 Md. 430 (2013). In that case, the Court of Appeals considered whether a trial court abused its discretion in overruling Dzikowski's exceptions to the State's refusal to provide the information requested by his demand for particulars because the State believed that the

24

information requested by that demand had been previously given to him before trial.  The

pertinent facts of that case, as summarized by the Court of Appeals, were as follows:

> Dzikowski[] was driving a vehicle with five other passengers at 1:00 a.m. in Gaithersburg, Maryland on January 6, 2008, when he came upon a man, later identified as Manuel Ramirez-Gavarete, standing in the middle of the road, and, as a result, had to swerve in order to avoid colliding with him.  After passing Mr. Ramirez-Gavarete, however, and upon the suggestion of one of the passengers, [Dzikowski]  returned to the scene.  Once there, when he and one of the passengers, Joshua Jones, got out of the vehicle, Mr. Ramirez-Gavarete, who appeared to be highly intoxicated, staggered towards them and attempted to hug or lean on the petitioner.  [Dzikowski] pushed him away, nearly knocking him into a slowly passing vehicle.  Mr. Ramirez-Gavarete then approached Mr. Jones, who struck him in the face, knocking him down onto the roadway.  [Dzikowski] and Mr. Jones then immediately drove away, leaving Mr. Ramirez-Gavarete lying in the road.  Shortly thereafter, another vehicle ran over Mr. Ramirez-Gavarete, killing him.

*Id.* at 434-35.

Dzikowski was charged in a three-count indictment, filed in the Circuit Court for

Montgomery County, with manslaughter, reckless endangerment, and conspiracy to commit

assault.  *Id.* at 435.  The reckless endangerment count merely stated, as provided in the

statutory short-form indictment, that Dzikowski, "on or about January 6, 2008, in

Montgomery County, Maryland, committed reckless endangerment, in violation of

Section  3-204 of the Criminal Law Article against the peace, government, and dignity of the

State."[29]  *Id.* at 436.  Invoking Maryland Rule 4-241, Dzikowski filed a demand for a bill of particulars as to the charge of reckless endangerment.  When the State responded, to each of his enumerated requests, that the facts requested were "contained in discovery," Dzikowski filed exceptions to what he deemed an insufficient response.  *Id.* at 437.  Ultimately, the

---

[29]Maryland Code (2002), Criminal Law Article, § 3-206(d), in effect at the time of trial, provided:

> (d)     (1)  To be found guilty of reckless endangerment under § 3-204 of this subtitle, a defendant must be charged specifically with reckless endangerment.
>
> (2)  A charging document for reckless endangerment under § 3-204 of this subtitle is sufficient if it substantially states:
>
> "(name of defendant) on (date) in (county) committed reckless endangerment in violation of § 3-204 of the Criminal Law Article against the peace, government, and dignity of the State.".
>
> (3)  If more than one individual is endangered by the conduct of the defendant, a separate charge may be brought for each individual endangered.
>
> (4) A charging document containing a charge of reckless endangerment under § 3-204 of this subtitle may:
>
> (i) include a count for each individual endangered by the conduct of the defendant; or
>
> (ii) contain a single count based on the conduct of the defendant, regardless of the number of individuals endangered by the conduct of the defendant.
>
> (5) If the general form of charging document described in paragraph (2) of this subsection is used to charge reckless endangerment under § 3-204 of this subtitle in a case in the circuit court, the defendant, on timely demand, is entitled to a bill of particulars.

The 2012 Replacement Volume contains an identical provision.

circuit court overruled those exceptions, holding that the State had complied with Rule 4-241(b).

The Court of Appeals noted that, in its opening statement at Dzikowski's trial,[30] the State stressed that Dzikowski (with co-defendant Jones) had committed "needless senseless violence" and had left Ramirez-Gavarete "in the middle of the road, where he was then hit and killed by another car." *Id.* at 439. The State further alleged that both Dzikowski and Jones "pushed" Ramirez-Gavarete but, in the words of the Court of Appeals, "did not reference or even mention that it was in the direction of a passing vehicle." *Id.* Instead, the State proffered that, after both Dzikowski and Jones had taken turns "push[ing]" Ramirez-Gavarete, Jones "punched" him, "knocking him down" and apparently "out." The two men then left him in the middle of a "very dark" and "very dangerous" road, where he was subsequently run over and killed by a passing vehicle. *Id.* at 439-40.

At the conclusion of the State's case-in-chief, Dzikowski moved for judgment of acquittal as to all counts. The trial court granted his motion as to the counts alleging manslaughter and conspiracy but denied it as to the count of reckless endangerment, which, at that point, was the only remaining count. As to that charge, the trial court found that, based upon testimony of the driver of the "slowly passing vehicle," which had nearly struck Ramirez-Gavarete when Dzikowski shoved him in the direction of that vehicle, that

---

[30]Dzikowski and Jones were tried jointly. *Dzikowski v. State*, 436 Md. 430, 439 (2013) (quoting the State referring to Jones as the "co-defendant").

27

Dzikowski had "timed" his shove of Ramirez-Gavarete "as though it were planned that . . . when he pushed him, he would collide with this car." *Id.* at 440. Although this on-coming vehicle was traveling "at a crawl," acknowledged the trial court, "if you lose your footing, and you fall underneath the wheels of a car going five miles an hour," you will still be, the court observed, "a dead person." *Id.* The trial court therefore concluded that there was "sufficient evidence from which a jury could conclude that there was reckless endangerment." *Id.*

"Armed with that ruling, the State thereafter proceeded on a new theory and factual basis," observed the Court of Appeals. *Id.* That is to say, the State departed from its reliance upon Jones punching the victim, knocking him down, and leaving him in the road, to prove reckless endangerment, in favor of "rel[ying] on the fact that" Dzikowski pushed Ramirez-Gavarete "in the direction of a slowly passing car, thus recklessly endangering him." *Id.* After he was convicted of reckless endangerment, Dzikowski appealed, claiming that he had been unfairly surprised and prejudiced by the State's mid-trial shift in strategy. *Id.* at 441.

The Court of Appeals ultimately reversed and remanded for a new trial. *Id.* at 441, 457. In so doing, the Court of Appeals noted that, because Dzikowski had been charged, under a statutory short-form indictment, with reckless endangerment, he was entitled to have the State respond to his demand for a bill of particulars, under Criminal Law Article, § 3-206(d)(5), which provides that, under that circumstance, "the defendant, on timely

28

demand, is entitled to a bill of particulars." *Dzikowski*, 436 Md. at 446. This statutory entitlement, the Court of Appeals observed, is intended "to provide 'such a description of the particular act to have been committed as to inform [the accused] of the specific conduct with which he is charged.'" *Id.* at 448 (quoting *Ayre v. State*, 291 Md. 155, 163 (1981)). Moreover, it is constitutionally required, declared the Court, so as to "apprise the defendant of the crime with which he is accused, as well as of the particular conduct to which that accusation relates and refers." *Id.*

Ordinarily, the charging document itself must provide the accused with the "constitutionally required" notice of "what he is called upon to defend," *Ayre*, 291 Md. at 163 (citing Article 21 of the Maryland Declaration of Rights), but the statutory short-form indictment, at least as to certain offenses, is typically lacking in such information. In those instances, the accused has a statutory right to particulars, which furnishes that information. *Dzikowski*, 436 Md. at 448, 453-54. Indeed, as the *Dzikowski* Court observed, the charging document in that case merely stated that Dzikowski, "on or about January 6, 2008, in Montgomery County, Maryland, did commit reckless endangerment, in violation of Section 3-204 of the Criminal Law Article," providing no information as to the underlying facts. *Id.* at 448.

"Generally," whether to grant or refuse a demand for a bill of particulars is within the trial court's discretion, as is the "the determination of whether the particulars provided were legally sufficient." *Id.* at 446-47. In *Dzikowski*, the trial court abused its discretion in

29

overruling Dzikowski's exceptions, held the Court of Appeals, as the State's response to Dzikowski's demand for a bill of particulars merely directed him to discovery materials and therefore violated Criminal Law § 3-206(d)(5), which required that he be informed of "the factual basis underlying the reckless endangerment charge." *Dzikowski*, 436 Md. at 449, 452. The Court of Appeals further held that the "trial court's legal error,"[31] *id.* at 454, was not harmless beyond a reasonable doubt, because it was "possible" that Dzikowski was "prejudiced" by the State being permitted "to proceed upon a factual basis, on which it did not rely, or even acknowledge, in the indictment, in the bill of particulars it filed and throughout the first half of the trial." *Id.* at 456. Then, before reversing Dzikowski's conviction, the Court rejected any suggestion that Dzikowski's demand for a bill of particulars sought "the State's legal theory of the case." *Id.* at 452.

Charged with first- and second-degree assault and reckless endangerment, in a short-form indictment, Martin had, because of those charges,[32] the same statutory right to a bill of particulars granted Dzikowski by Criminal Law § 3-206(d). Martin does not, however, rely upon Criminal Law § 3-206(b) or (d) and, in fact, makes no mention of those statutory subsections in either his initial or reply brief. Instead, his dispute with the State's response to his demand for a bill of particulars focuses specifically and only on the State's

---

[31]Because the trial court, in *Dzikowski*, based its exercise of discretion upon a legal error, it "necessarily" abused its discretion. *Bass v. State*, 206 Md. App. 1, 11 (2012).

[32]*See* CL § 3-206(b) (providing that an accused, charged with either first- or second-degree assault by a short-form indictment or information, "on timely demand, is entitled to a bill of particulars").

30

theory of his criminal agency with respect to the attempted murder charges. We further presume that that is because the assault and reckless endangerment charges were nol prossed by the State, or, as in the case of first-degree assault, subsumed into the greater offense, attempted first-degree murder. Moreover, the conspiracy charge was also nol prossed and thus, despite being the focal point of much of the argument below, is no longer a part of this case. Furthermore, Martin was acquitted of the solicitation charge, extinguishing its relevance and removing it from further consideration.

The case at bar is distinguishable from *Dzikowski*, though the two cases share one similarity, which we believe to be of no consequence here, and that is, in both *Dzikowski* and the instant case, the State's response to the demand for a bill of particulars was, in essence, that no response was necessary because it followed a policy of "open file discovery." *Id.* at 438. What renders the two cases disanalogous for the purposes of this decision is that, while Dzikowski was charged with reckless endangerment, by short-form indictment, and was therefore entitled to a bill of particulars, Martin was charged with attempted murder, and though it was also by short-form indictment, the crime of attempted murder is not an offense which carries with it this entitlement. *See Spector v. State*, 289 Md. 407, 423 (1981) (observing that, while an accused has a right to a charging document that meets constitutional requirements, he "is not entitled as of right to particulars").[33]

---

[33]Martin does not contend in this Court that the indictment was defective.

Although Martin couches his argument in terms of what he calls "different factual scenario[s]" presented by the State, his complaint is actually with the State's refusal to elect, prior to trial, a particular legal theory on which to proceed and then to inform him of the theory it chose. That is clear from the following language in Martin's demand for a bill of particulars:

> 5. State with particularity if Defendant is charged with the alleged offense as a principal in the first degree or as a principal in the second degree.
>
> 6. State with particularity all facts the State intends to prove that show Defendant acted as a principal in the first degree or as a principal in the second degree.

His demand thereby directs the State to declare what theory of criminal culpability it has chosen to proceed upon. An accused, however, is not entitled to know the State's theory of the case prior to trial and, under Maryland Rule 4-241, has no right to compel the State to disclose it. *Hadder*, 238 Md. at 351.

Martin further complains that, during the trial, the State changed its theory of the crime, thereby unfairly prejudicing his efforts to defend himself. He asserts, without elaboration, that the State, during its opening statement, "presented argument that Jerold Burks was definitely the shooter, that Appellant had solicited his assistance, and that Appellant was guilty as a principal in the second degree by aiding and abetting Burks at the scene." That assertion unfortunately distorts what the State actually said in its opening statement. In fact, it is fair to say that the State made no such assertions about Burks, who,

32

by that time, had already been acquitted of all charges stemming from his alleged role in the crime.

We further reject Martin's contention that, during trial, the State's theory "morphed into one that made [him] only an accessory before the fact," that is, as the Court of Appeals has put it, "one who is guilty of felony by reason of having aided, counseled, commanded or encouraged the commission thereof, without having been present either actually or constructively at the moment of perpetration." *State v. Ward*, 284 Md. 189, 197 (1978), *overruled on other grounds*, *Lewis v. State*, 285 Md. 705, 714-16 (1979). The State's opening statement alleged that Martin, Frank Bradley, and Jerry Burks had constructed the home-made silencer at Maggie McFadden's house, which clearly conveyed the State's belief that Martin was an accessory before the fact, a belief substantiated at trial by DNA evidence presented by the State connecting Martin to the homemade silencer.

The instant case is quite unlike *Dzikowski*. There, the circuit court erroneously permitted the State "to proceed upon a factual basis, on which it did not rely, or even acknowledge, in the indictment, in the bill of particulars it filed and throughout the first half of the trial," and that error, as the Court of Appeals pointed out, may have affected Dzikowski's trial preparation or strategy. *Id.* at 456-57. In contrast, here, there was no possibility that Martin was either unfairly surprised or prejudiced at trial because he knew, from the start, that the State would attempt to prove his participation in the steps taken to consummate the attempted murder of the victim, as an accessory before the fact.

**IV.**

Martin contends that the evidence was insufficient to sustain his conviction of attempted murder in the first degree. Specifically, he submits that "the most damning pieces of evidence, those relating to [his] activities in Maggie McFadden's house on the day of [the] shooting, were provided by" Michael Bradley, "a witness who originally told police a completely different story from the one he related at trial, was granted immunity from the present case and leniency in another in exchange for his testimony, and previously had been convicted of obstruction of justice."

In reviewing a claim of insufficiency in a criminal case, we determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Thus, we do "not re-weigh the credibility of witnesses or attempt to resolve any conflicts in the evidence." *Smith v. State*, 415 Md. 174, 185 (2010).

Applying this rule of appellate review, we conclude that Martin's argument as to "the most damning pieces of evidence" is a red herring. The factors he raises in support of it, such as the alleged inconsistencies in the stories told by the State's witness and whether that witness received favorable treatment in exchange for his testimony, bear only on witness credibility, not the sufficiency of the evidence, and therefore lie beyond the scope of our review.

Martin further asserts that, although "it might be reasonable for a finder of fact to conclude that these facts [as summarized] could be consistent with [his] guilt, it simply is not the case that they are inconsistent with every single reasonable theory of his innocence." He then asks us to apply the standard articulated in *Wilson v. State*, 319 Md. 530, 537 (1990), where the Court of Appeals stated that "a conviction upon circumstantial evidence *alone* is not to be sustained unless the circumstances, taken together, are inconsistent with any reasonable hypothesis of innocence." *See also Jones v. State*, 395 Md. 97, 120 (2006); *Moye v. State*, 369 Md. 2, 13 (2002); *Hebron v. State*, 331 Md. 219, 224 (1993); *West v. State*, 312 Md. 197, 211-12 (1988).

Martin's reliance on *Wilson* and its progeny is misplaced. First of all, "Maryland has long held that there is no difference between direct and circumstantial evidence." *Hebron*, 331 Md. at 226. It is, in fact, now an axiom of law that "[n]o greater degree of certainty is required when the evidence is circumstantial than when it is direct, for in either case the trier of fact must be convinced beyond a reasonable doubt of the guilt of the accused." *Id.* at 226-27 (quoting *Gilmore v. State*, 263 Md. 268, 292 (1971), *vacated in part on other grounds*, 408 U.S. 940 (1972)).

And, contrary to what Martin claims, circumstantial evidence "need not be such that no possible theory other than guilt can stand." *Id.* at 227 (quoting *Gilmore*, 263 Md. at 293). That is to say, "[i]t is not necessary that the circumstantial evidence exclude every possibility of the defendant's innocence, or produce an absolute certainty in the minds of the jurors."

35

*Id.* (quoting *Gilmore*, 263 Md. at 293). Indeed, the Court of Appeals recently noted that, notwithstanding the "reasonable hypothesis of innocence" language in *Wilson* and succeeding cases, "it is well established" that the standard that Martin "champions" is not "the focus of the standard to be applied when reviewing the sufficiency of the evidence in criminal cases." *Smith*, 415 Md. at 183. Appellate courts, it warned, should not "second-guess the jury's determination where there are competing rational inferences available." *Id.* And, finally, this Court recently stated "that the better test is 'whether the evidence, circumstantial or otherwise, and the inferences that can reasonably be drawn from the evidence, would be sufficient to convince a rational trier of fact beyond a reasonable doubt, of the guilt of the accused.'" *Clark v. State*, 188 Md. App. 110, 116 (2009) (quoting *Hagez v. State*, 110 Md. App. 194, 204 (1996)).

Applying this "better test," a test consistent with the approach approved by the Court of Appeals in *Smith*, 415 Md. at 183-86, to the instant case, we hold that there was sufficient, indeed ample, evidence of Martin's guilt. To begin with, there was evidence that Martin had a motive to kill. The victim had told Martin that she was pregnant with his child and had refused his request that she undergo an abortion. Were she to have his child, Martin would have had to contribute, much to his chagrin, to the support of that child, a point the victim impressed upon an enraged Martin. Equally discomforting for Martin, the birth of the child in question would have inevitably led to the discovery of his infidelity by his wife and significant others.

36

Furthermore, the forensic evidence linked Martin to the homemade silencer found at the crime scene. An expert for the State testified that the hair found on the silencer most likely came from someone in the same direct maternal line as Martin and that only 0.06 per cent of the population in North America would be expected to have similar DNA. And, as for the saliva found on the home-made silencer, the State introduced expert testimony that the DNA test results excluded "approximately 94 percent of the Caucasian population" of, presumably, North America, as well as "approximately 96 percent of the African-American population" of, we assume, the same geographical area, from consideration, but not Martin.[34]

Moreover, the testimony of Sheri Carter, one of his erstwhile girlfriends, if believed by the jury, established that: (1) shortly before the shooting, Martin used a computer to conduct internet research on how to assemble a homemade silencer; (2) on that same occasion, Martin took a pair of plastic surgical gloves from her home; (3) approximately one week after the shooting and shortly after Martin had been questioned by police, Martin took the computer from her apartment and "got rid of" it; and (4) during the two-month period immediately preceding the shooting, Martin was observed by Ms. Carter to be carrying a "small, silver, [black-handled], semi-automatic" handgun. Consistent with Carter's

_____

[34] Although that expert, Sarah Chenoweth, did not testify as to whether the populations she considered were from North America, we infer that she used that database in her analysis, as that was the reference population used by the other expert, Dr. Terry Melton, in analyzing the mitochondrial DNA evidence. This inference is consistent with the standard of review we apply in addressing a claim of evidentiary sufficiency. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (requiring that, in determining whether evidence was sufficient, we "view[] the evidence in the light most favorable to the prosecution").

testimony, Michael Bradley testified that Martin owned a handgun, a fact confirmed by records from the United States Bureau of Alcohol, Tobacco, Firearms, and Explosives, which were introduced by the State. In fact, those records showed that, in 2003, Martin had purchased two .380 caliber handguns, which was the same caliber as the weapon used to shoot the victim.

Martin also had the opportunity to commit the crime, as he had been able to establish, through text messages, that the victim was at home the day of the crime. The testimony of Michael Bradley, moreover, implicated him in the preparation of the silencer and the planning of the shooting. Finally, the jury could have reasonably inferred, based on Michael Bradley's testimony that Martin and Burks left Maggie McFadden's home the afternoon of the shooting and returned several hours later, that Martin transported Burks to the crime scene.

In sum, a reasonable fact finder could have found, beyond a reasonable doubt, based on the evidence presented by the State, that Martin planned and participated in the shooting.

## V.

Martin contends that the circuit court erred both in giving the State's proposed jury instruction on accessory before the fact and in refusing to give his proposed instruction on aiding and abetting. He further asserts that "the State originally had proceeded on an aider and abettor argument" but, later, during trial, switched gears and advanced a different theory of criminality, namely, that Martin was actually an accessory before the fact, and that the trial

38

court's actions, in giving the State's instruction while refusing his, "reward[ed] the State for fostering uncertainty through inconsistency and unpreparedness."

As to his proposed aiding-and-abetting instruction, Martin insists that, at the beginning of trial, the State "opted to introduce" that theory and that it should have been forced "to cope with the consequences of doing so." He maintains, moreover, that his proposed instruction was a correct statement of the law, was applicable to the facts of the case, and was not fairly covered by any other instruction given and that the trial court's refusal to give that instruction therefore violated Maryland Rule 4-325.

As interpreted by the Court of Appeals, Maryland Rule 4-325 provides that a circuit court may not refuse to give "a requested jury instruction" (1) when that instruction "is a correct statement of the law"; (2) when it is "applicable to the facts of the case"; and (3) when "the content of the instruction was not fairly covered elsewhere in instructions actually given." *Cost v. State*, 417 Md. 360, 368-69 (2010) (citation and quotation omitted).

To prove that Martin was an aider and abettor, the State was required to prove, among other things, that Martin "was present when the crime was committed." *Maryland Criminal Pattern Jury Instructions* 6:01 ("Aiding and Abetting"). And, as the State points out, Martin, himself, acknowledges that there was insufficient evidence that he was present at the scene of the shooting.[35] Thus, his proposed aiding-and-abetting jury instruction was not

_____

[35] In his brief, Martin states: "Simply because the State decided to change theories upon realizing there was insufficient evidence to convict . . . under [an aiding and abetting
(continued...)

39

"applicable to the facts of the case," *Cost*, 417 Md. at 368, and the circuit court did not err in refusing to give that instruction. *Id.* at 369.

Nor did the circuit court err in giving the State's requested "accessory-before-the-fact" instruction. As previously noted in Part IV of this opinion, there was ample evidence that Martin participated in the assemblage of the homemade silencer found at the scene of the shooting. Hence, the State's accessory-before-the-fact instruction was, to be sure, "applicable to the facts of the case." *Id.* at 368. Since Martin does not contend that this instruction misstated the law, or that another instruction "fairly covered" the content of the accessory-before-the-fact instruction, *id.* at 368-69, we have no grounds upon which to find that the circuit court erred in giving the State's requested instruction.

## VI.

Martin claims that the circuit court erred in accepting inconsistent verdicts. He refers specifically to two verdicts: one that convicted him of attempted first-degree murder, the other that acquitted him of solicitation to commit murder. The State responds that, because Martin failed to raise this issue when the verdicts were announced, the issue is unpreserved for our review. It adds that, even if this issue had been preserved, the verdicts were, at most, factually, but not legally, inconsistent and that, therefore, under *McNeal v. State*, 200 Md.

_____

[35](...continued)
theory] is not reason enough for the court to refuse an[] otherwise proper jury instruction."

40

App. 510, *cert. granted*, 424 Md. 55 (2011),[36] the circuit court did not err in accepting the verdicts.

After the jury foreperson announced the verdicts, Martin's counsel requested that the jury be polled. At the conclusion of the poll, the verdict was hearkened, and the jury was excused. The court then ordered a pre-sentence investigation ("PSI") report and proceeded to discuss, with counsel, the scheduling of the sentencing hearing. After confirming that defense counsel would explain to Martin what a "PSI" was and how the sentencing would proceed, the court informed Martin of his right to file a motion for a new trial and the court adjourned. At no time did Martin object to the allegedly inconsistent verdicts.

In *Tate v. State*, 182 Md. App. 114, *cert. denied*, 406 Md. 747 (2008), we held that, to preserve for appeal a claim that a jury has rendered inconsistent verdicts, "a defendant must note his objection" to the inconsistent verdicts "while the trial court has an opportunity to remedy the error," that is, before the verdicts are "final and the jury is discharged. Failure to do so constitutes waiver." *Id.* at 136 (quoting *Price v. State*, 405 Md. 10, 42 (2008) (Harrell, J., concurring)). It is undisputed that Martin failed to object below to what he now alleges were inconsistent verdicts. In fact, he waited until this appeal to raise this issue. We therefore hold that the issue is not properly before us.

_____

[36]As we shall hereafter explain, during the pendency of this appeal, the Court of Appeals affirmed the holding and reasoning of this Court in that case. *McNeal v. State*, 426 Md. 455 (2012), *aff'g* 200 Md. App. 510 (2011).

In any event, if the issue had been preserved for our review, we would find that it has no merit. The Court of Appeals held, during the pendency of this appeal, that, while legally inconsistent jury verdicts in criminal cases are "prohibited," jury verdicts "which are illogical or factually inconsistent are permitted." *McNeal v. State*, 426 Md. 455, 458-59 (2012), *aff'g* 200 Md. App. 510 (2011). It defined "legally inconsistent verdicts" as those verdicts "where a defendant is acquitted of a 'lesser included' crime embraced within a conviction for a greater offense." *Id.* at 458 n.1. A "lesser included crime" is a "required element of the greater" crime. *Tate*, 182 Md. App. at 131.

Martin was convicted of attempted first-degree murder. The "elements of attempted murder in the first degree are the intent to commit murder in the first degree and some overt act towards the crime's commission." *State v. Holmes*, 310 Md. 260, 271-72 (1987). And "the intent required for first[-]degree murder is that it shall have been wilful, deliberate, and premeditated."[37] *Id.* at 272. Consequently, to prove that Martin was guilty of attempted murder in the first degree, the State had to prove that he "had the wilful, deliberate, and premeditated intent to kill" the victim, and that he committed "some overt act towards that end." *Id.*

On the other hand, the crime of which Martin was acquitted, solicitation to commit murder, required the State to prove that he counseled, enticed, or induced another to commit

---

[37]The only exception to this rule is where the defendant is charged with first-degree felony murder. *State v. Holmes*, 310 Md. 260, 272 n.5 (1987).

42

the crime of murder. *Denicolis v. State*, 378 Md. 646, 659 (2003). "The person solicited need not commit, attempt to commit, or even intend to commit the act for the solicitation to be complete. The solicitation is complete once the incitement is made, even if the person solicited does not respond at all." *Monoker v. State*, 321 Md. 214, 220 (1990).

Solicitation to commit murder is, to be sure, not a lesser included offense of attempted first-degree murder. While solicitation requires proof that the accused counseled, enticed, or induced another to commit murder, attempted first-degree murder does not.

Martin was acquitted of solicitation, presumably because the State had failed to prove, beyond a reasonable doubt, that he had counseled, enticed, or induced anyone else to murder or attempt to murder the victim. But, that is all that his acquittal suggested. There is no legal inconsistency between Martin's conviction of attempted first-degree murder and his acquittal of solicitation. Indeed, there may not be even a factual inconsistency between the verdicts, because the jury could have found that whoever assisted Martin in the planning and logistics of the murder attempt volunteered his assistance, without any counseling, enticement, or inducement by Martin.

## VII.

Martin contends that the circuit court erred in sentencing him. The court, he claims, "improperly" considered a letter "allegedly" written by him and then, by imposing a life sentence instead of a sentence within the guidelines applicable to him, which were five to ten years, "effectively sentenced [him] for a crime of which he had been acquitted[.]"

43

To begin with, the State maintains that Martin has failed to preserve the "letter" issue for our consideration. "At no time during sentencing," the State avers, did Martin "voice any objection to consideration of the letter he now challenges." Rather, according to the State, Martin "challenged the admission of the letter on authentication grounds" and "objected to the State's request that the sentencing hearing be postponed so it could authenticate the letter" but "did not object to the letter being considered by the court." Invoking *Reiger v. State*, 170 Md. App. 693, 700 (2006), a case which held that, in the absence of a contemporaneous objection, a defendant may not claim, on appeal, that a court considered improper evidence or impermissible factors when imposing sentence, the State insists that Martin "has given up any right to argue on appeal that the sentencing judge was motivated by impermissible considerations."

At the sentencing hearing, Thomas Laue, an administrator at the Jennifer Road Detention Center in Anne Arundel County, where Martin was incarcerated while awaiting imposition of sentence, testified that, in performing his duty to screen mail to and from inmates, he noticed an unusual piece of mail that Martin was attempting to send. The letter, which attracted his attention, "didn't have a return address," although "the outside [envelope] had the name Lil D written on it."[38]

---

[38] It is clear from the transcript that the letter was introduced into evidence at the sentencing hearing and was considered by the court. The suspicious letter and the envelope containing it, although referred to in the list of State Exhibits, are not part of the record before us.

The letter appeared to instruct an unknown recipient to enlist Jerry Burks in an effort to falsely implicate Maggie McFadden in the shooting at issue and have Burks place telephone calls to the prosecutor to achieve that end. For that purpose, it contained instructions on how to place telephone calls without the risk of their being traced and included an offer of "a paid lawyer" to Burks should he agree to cooperate.[39] The letter further proposed, according to the State, that an e-mail be sent (by whom, the record does not say) "to law enforcement [which] would also shift the blame from Martin to Maggie [McFadden]." The letter then concluded with a veiled instruction to kill Burks once he had completed the task of planting the false accusation.[40]

The State also introduced, at sentencing, testimony from Diane Lawder, a forensic scientist with the Maryland State Police and an expert in the field of forensic document examination. Having compared the handwriting in the letter and on the envelope with that from a sample of Martin's handwriting, she opined that it was "virtually certain" that the handwriting in the letter belonged to Martin, whereas the handwriting on the envelope did not. Over objection, the State introduced the letter and envelope into evidence.

_____

[39]At the time the letter was intercepted, on June 16, 2010, Burks had already been acquitted of all charges based upon his alleged role in the attempted murder.

[40]The State read, in open court, the following quote from the letter:

> "Take [Burks] down the road somewhere and do what you do, make sure there is no coming back. Be safe, and if you have to do it different okay, but make sure the call and (indiscernible - 10:29:00) are in place and e-mail makes it all the best. Just tell him a friend is trying to help him."

At the conclusion of the sentencing hearing, the court imposed the maximum allowable sentence, life imprisonment. The court expressly noted that it was imposing a sentence greater than the range of sentence recommended by the sentencing guidelines and then articulated specific reasons for doing so, namely: Martin's major role in the offense, the excessive level of harm inflicted by his crime, his exploitation of a position of trust, and the "vicious or heinous nature of [his] conduct." It did not directly or indirectly suggest that the letter, in any way, influenced the sentence it imposed.

Turning now to Martin's claim of sentencing error, we begin by addressing the State's non-preservation argument. Although the State cites *Reiger v. State*, *supra*, 170 Md. App. 693, in support of its argument, we find that another case is more directly on point—that case is *Brecker v. State*, 304 Md. 36 (1985), a case that is addressed briefly in *Reiger*. 170 Md. App at 699.

Brecker was convicted of, among other things, storehouse breaking and malicious destruction of property and was ordered to pay restitution of $1,036.76. *Brecker*, 304 Md. at 37-38. "At no time did the trial court make any inquiry into [Brecker's] ability to pay," and that failure to so inquire was the basis of Brecker's appeal. *Id.* at 39. Because Brecker objected, at his sentencing hearing, on the ground that the amount of restitution had not been proven, but he did not then object on the ground that the court had failed to inquire into his ability to pay restitution, the Court of Appeals deemed his appellate contention waived. *Id.* at 40-42.

In the case at bar, the State makes a similar argument, that the claim raised on appeal is different from the claim raised at Martin's sentencing hearing, and, therefore, his appellate claim should be deemed waived. We agree. Martin challenged, during his sentencing hearing, the authenticity of the letter at issue, but at no time did he contend below that, upon proof of the letter's authenticity, it was nonetheless improper for the circuit court to consider its substance. In that respect, the instant case is analogous to *Brecker*, and, applying the holding in that case, we hold that Martin's improper consideration claim was waived.

Even if Martin had preserved this issue for our review, we would find that it has no merit. "[A] sentencing judge in a criminal proceeding is 'vested with virtually boundless discretion.'" *State v. Dopkowski*, 325 Md. 671, 679 (1992) (quoting *Logan v. State*, 289 Md. 460, 480 (1981)). Maryland appellate courts recognize only three grounds for challenging a sentence imposed by the circuit court. Those grounds arise when: (1) the sentence violates the Eighth Amendment prohibition against cruel and unusual punishment, or its Maryland cognates[41]; (2) the sentence exceeds statutory limits; or (3) the sentencing court was

---

[41]Article 16 of the Maryland Declaration of Rights provides:

> That sanguinary Laws ought to be avoided as far as it is consistent with the safety of the State; and no Law to inflict cruel and unusual pains and penalties ought to be made in any case, or at any time, hereafter.

Article 25 of the Maryland Declaration of Rights provides:

> That excessive bail ought not to be required, nor excessive fines

(continued...)

47

motivated by ill-will, prejudice, or other impermissible considerations. *Id.* at 680. Only the third ground is alleged here.

"The strict rules of evidence do not apply at a sentencing proceeding." *Id.*; *see Williams v. New York*, 337 U.S. 241, 246-47 (1949). "In order to impose what is necessary to accomplish [the objectives of sentencing], [the sentencing judge] has a very broad latitude, confined only by unwarranted and impermissible information, to consider whatever he has learned about the defendant and the crime." *Johnson v. State*, 274 Md. 536, 540 (1975). The sentencing judge may consider, among other things, "the evidence presented at the trial, the demeanor and veracity of the defendant gleaned from his various court appearances, as well as the data acquired from such other sources as the presentence investigation or any personal knowledge the judge may have gained from living in the same community as the offender." *Id.* Moreover, "a sentencing judge may properly consider uncharged or untried offenses." *Smith v. State*, 308 Md. 162, 172 (1986).

The State introduced, at Martin's sentencing hearing, a letter showing that, while awaiting sentencing, Martin solicited an unknown person to persuade Burks to leave telephone messages falsely implicating McFadden in the shooting and, upon completion of that illicit task, to kill Burks. Given the "very broad latitude" the sentencing judge possesses,

---

[41](...continued)
imposed, nor cruel or unusual punishment inflicted, by the Courts of Law.

she acted within her discretion in considering the letter, even if it constituted evidence of an uncharged offense. *Smith*, 308 Md. at 172.

We also reject Martin's contention that the sentencing judge improperly sentenced him, in effect, for a crime of which he had been acquitted, as evidenced by the fact that his sentence was substantially greater than the sentencing guidelines recommended. In *Henry v. State*, 273 Md. 131, 140-51 (1974), the defendant made a similar type of claim (though, at that time, the Maryland Sentencing Guidelines did not exist).[42] The Court of Appeals held, however, that a sentencing judge may consider the defendant's involvement in crimes of which he was acquitted by a jury, so long as the sentence imposed does not exceed the statutory maximum for the crimes of which he was convicted. *See also Owens v. State*, 161 Md. App. 91, 101 (2005) ("Unfortunately, at times, an accused is improperly acquitted of a crime.") (quoting *Jeter v. State*, 9 Md. App. 575, 582 (1970), *aff'd*, 261 Md. 221 (1971)).

Martin was sentenced to the maximum penalty, life imprisonment, for the crime of which he was convicted: attempted murder in the first degree. *See* Md. Code (2002), § 2-205 of the Criminal Law Article. Because the sentence was authorized by statute and because Martin has failed to show that the sentencing judge was motivated by ill-will,

---

[42]The Maryland State Commission on Criminal Sentencing Policy, the body that promulgates the Maryland Sentencing Guidelines, was established by chapter 648 of the 1999 Laws of Maryland. *See* 1999 Md. Laws, ch. 648, at 3564, 3568-74.

prejudice, or other impermissible considerations, there are no grounds for vacating that sentence.

**JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**